James J. BIGGINS, Jr., as Trustee for
Peterson Ford, a California corpo-
ration, Bankrupt, Plaintiff,

v.

SOUTHWEST BANK, a California bank-
ing corporation, Defendant.

No. 68–282–J.

United States District Court,
S. D. California.

Jan. 26, 1971.

Woolley, Crake, Collins & Ward, San Diego, Cal., for plaintiff.

Goldman, Goldman & Arnold, Los Angeles, Cal., and Weil & Fritz, Whittier, Cal., for defendant.

## ORDER AND MEMORANDUM OPINION

· JAMESON, District Judge.

Plaintiff, as trustee for Peterson Ford, Bankrupt, has brought this action against defendant, Southwest Bank, under Section 60 of the National Bankruptcy Act, 11 U.S.C. § 96, seeking to recover the value of property and credits allegedly taken and received from the bankrupt in preference to other creditors of the same class. Defendant claims that it is entitled to the property and credits by reason of a perfected security under the California Commercial Code and a banker's lien.

Peterson Ford, a corporation engaged in the business of selling automobiles, was a customer of the defendant bank, which financed its sales and service of new and used cars. On October 10, 1966, Peterson Ford and the bank entered into an "Automobile Dealer Agreement",[1] whereby the bank agreed to purchase "such conditional sales contracts from Dealer covering the sale of motor vehicles as are acceptable to Bank at agreed rates of discount." The agreement provided that "[e]ach contract shall be assigned and guaranteed by Dealer in form satisfactory to Bank" and that the purchase price of each contract "shall be paid to Dealer or credited to his account when the contract is purchased and thereupon full title to the contract shall pass to Bank." The agreement required that a dealer reserve account be deposited with the bank and maintained at an amount equal to three per cent of the total value of chattel paper negotiated through the bank.[2]

On December 6, 1966, a "Financing Statement" was executed by Peterson Ford as "debtor" and Southwest Bank as "secured party" and presented for filing pursuant to the California Commercial Code. This financing statement covered "sales and service of new and used automobiles."[3] Various conditional sales contracts and flooring agreements were

---

1. The provisions of this agreement are not essentially different from those contained in suggested Form 9:1310 entitled "Agreement between Automobile Dealer and Bank under Which Dealer Guarantees Performance Of Conditional Sale Contracts Purchased From It By Bank" in "Uniform Commercial Code Forms and Materials" by Henson and Davenport, 5 U.L.A. 295.

2. The Agreement provided further: "A bookkeeping entry representing the potential interest of Dealer shall be credited to Dealer Differential Account at the time of purchase of each contract. Bank will advance to Dealer monthly at his request any balance of Dealer Differential Account above 3 percentum of the unpaid balance on contracts then outstanding, provided, however, that if Dealer in the opinion of Bank becomes insolvent, or discontinues business, or if arrangements between Bank and Dealer are terminated, Bank need not make such advances to Dealer and earned excesses may be retained by Bank as security for Dealer's obligations to Bank then or thereafter existing, direct, or contingent, until such obligations are satisfied. Minimum Reserve $2500.00."

3. This financing statement was signed and filed in compliance with Section 9402 of the California Commercial Code, discussed infra.

executed by the bankrupt and assigned to the defendant bank subsequent to the execution of the automobile dealer agreement and the filing of the financing statement.[4]

Pursuant to a voluntary petition, Peterson Ford was adjudged a bankrupt on December 15, 1967. It is stipulated in the pretrial conference order that on or after August 15, 1967, a period within four months of bankruptcy, defendant obtained possession of the property described in Exhibit A to the amended complaint "on account of balances due prior to August 15, 1967." This exhibit presumably lists 29 automobiles and shows the dates of transfer between August 16, 1967 and October 14, 1967. Seven automobiles, however, are listed twice with different dates of transfer. In addition, the exhibit lists two Peterson Ford Dealer Reserve Accounts, with "transfers occurring on almost a daily basis since August 15, 1967."

Security agreements covering six of the 22 automobiles consisted of individual conditional sales contracts, three dated December 9, 1966 and three dated December 19, 1966, in which Peterson Ford is named as both seller and buyer. (Ex. A 1 to 6). These automobiles were demonstrators. The remaining 16 automobiles are listed in various agreements entitled "Security Agreement—Flooring." (Ex. C 1 to 5 and V 1).[5] Agree-

ments describing seven of the automobiles (Ex. C 1 to 5) were dated subsequent to August 15, 1967. These are the vehicles which were listed twice in the exhibit attached to the amended complaint.[6]

The provisions of Section 60 of the Bankruptcy Act (11 U.S.C. § 96) here applicable were summarized in DuBay v. Williams, 9 Cir. 1969, 417 F.2d 1277, 1286–1287:

"Section 60a(1) of the Bankruptcy Act * * * defines a 'preference' as (1) a transfer of any property of the debtor, (2) to or for the benefit of a creditor, (3) for or on account of an antecedent debt, (4) while the debtor is insolvent, (5) within four months of bankruptcy, (6) which enables the creditor to obtain a greater percentage of his debt than some other creditor of the same class. Section 60b permits the trustee to avoid a preference if the creditor had reasonable cause to believe that the debtor was insolvent at the time of the transfer.

*   *   *   *   *   *

"Section 60a(2) of the Bankruptcy Act provides that 'a transfer of property * * * shall be deemed to have been made or suffered at the time when it became so far perfected that no subsequent lien upon such property obtainable by legal or equitable proceedings on a simple contract could become

---

4. Other documents executed by the bankrupt include a chattel mortgage dated November 3, 1966 covering servicing equipment, parts equipment, furniture and fixtures (Ex. H–1), and a guarantee to Southwest Bank dated August 18, 1967 covering all indebtedness which the "Customer may now or at any time hereafter owe" the bank, to the extent of $30,000, as applied to "wholesale flooring only." (Ex. L–1).

5. This form of contract "grants to Southwest Bank * * * a security interest in the following described collateral * * * and all proceeds of sale thereof as security" for the payment of a promissory note of even date. The various agreements then describe from one to eight automobiles, including the 16 here involved.

6. The briefs of counsel simply refer in general terms to the exhibits. The court's examination of the various exhibits indicates the division herein set forth. A turnover petition in the bankruptcy proceedings also indicates the same division and that seven of the 16 used automobiles were covered by security agreements dated subsequent to August 15, 1967. The first of the security agreements covering the seven automobiles (C 1 to 5) was dated August 16 and the last September 20. The first of the security agreements shown for the other automobiles (V–1) was dated June 21, 1967 and the last August 1, 1967. The turnover petition recites that Peterson Ford went out of business in September, 1967.

superior to the rights of the transferee.'

"Congress did not state that a 'transfer' occurs when a security interest attaches or when state law says a conveyance has been made. Congress provided that a transfer is 'deemed' to have been made when it became 'so far perfected' that no subsequent lien creditor could achieve priority. 'Transfer' for the purpose of section 60a(2) is thus equated with the act by which priority over later creditors is achieved and not with the event which attaches the security interest to a specific account."

Plaintiff contends that the receipts from the sale of the repossessed automobiles and the funds in the reserve accounts constitute a "preference" within the meaning of Section 60(a) (1) of the Act. Defendant denies knowledge of the bankrupt's insolvency and contends that it had (1) a perfected security in the repossessed automobiles, and (2) the right to set off under a banker's lien the balances remaining in the reserve accounts. By agreement of the parties at pretrial conference on November 6, 1970, all factual issues relating to insolvency, knowledge of insolvency, and the value of property and moneys received by defendant were reserved for trial at a later date, if required.

Accordingly the sole questions for determination are whether defendant had a perfected security in the automobiles under the California Commercial Code and whether it had the right under a banker's lien to set off the balances in the reserve accounts.

The Uniform Commercial Code was adopted in California in 1963 as the California Commercial Code (West's Annotated Commercial Code §§ 1101 to 10104),[7] Division 9 of the California Code (Article 9 of the Uniform Code) relates to "Secured Transactions."

The "Official Comment" with respect to Article 9 of the Uniform Commercial Code reads in part:

"This Article sets out a comprehensive scheme for the regulation of security interests in personal property and fixtures. It supersedes existing legislation dealing with such security devices as chattel mortgages, conditional sales, trust receipts, factor's liens and assignments of accounts receivable * * *.

" * * *

"The aim of this Article is to provide a simple and unified structure within which the immense variety of present-day secured financing transactions can go forward with less cost and with greater certainty.

"Under this Article the traditional distinctions among security devices, based largely on form, are not retained; the Article applies to all transactions intended to create security interests in personal property and fixtures, and the single term 'security interest' substitutes for the variety of descriptive terms which has grown up at common law and under a hundred-year accretion of statutes. * * *

" * * *

"The scheme of the Article is to make distinctions, where distinctions are necessary, along functional rather than formal lines." (Comment on U. C.C. § 9–101; quoted in California Code Comment on § 9101).

Section 9102 of the California Commercial Code, relating to "Policy and Scope of Division" (9), provides in pertinent part:

" * * * [T]his division applies so far as concerns any personal property and fixtures within the jurisdiction of this State

"(a) To any transaction (regardless of its form) which is intended to create a security interest in personal property including goods, documents,

---

7. The section number in the official text of the Uniform Code contains a dash following the article (division in California).

In the California Code the dash has been removed, so that section 1–101 becomes 1101 and so on.

instruments, general intangibles, chattel paper, accounts or contract rights; and also * * *.

"(2) This division applies to security interests created by contract including pledge, assignment, chattel mortgage, * * * trust receipt, other lien or title retention contract and lease or consignment intended as security. * * * "

Section 9108 provides:

"Where a secured party makes an advance, incurs an obligation, releases a perfected security interest, or otherwise gives new value which is to be secured in whole or in part by after-acquired property his security interest in the afteracquired collateral shall be deemed to be taken for new value and not as security for an antecedent debt if the debtor acquires his rights in such collateral either in the ordinary course of his business or under a contract of purchase made pursuant to the security agreement within a reasonable time after new value is given."

Section 9110 relating to "Sufficiency of Description" provides:

"For the purposes of this division any description of personal property or real estate is sufficient whether or not it is specific if it reasonably identifies what is described. Personal property may be referred to by general kind or class if the property can be reasonably identified as falling within such kind or class or if it can be so identified when it is acquired by the debtor. The use of the word 'proceeds' is sufficient without further description to cover proceeds of any character." [8]

Section 9203 provides that a "security interest is not enforceable against the debtor or third parties unless * * * [t]he debtor has signed a security agreement which contains a description of the collateral * * *." Under Section 9204 a "security interest cannot attach until there is agreement * * * that it attach and value is given and the debtor has rights in the collateral." Section 9204(3) provides that "a security agreement may provide that collateral, whenever acquired, shall secure all obligations covered by the security agreement." [9] With certain exceptions not here applicable, "[a] financing statement must be filed to perfect all security interests." § 9302.

Section 9402 provides in pertinent part:

"A financing statement is sufficient if it is signed by the debtor and by the secured party, gives the name and mailing address of the secured party, the name and mailing address of the debtor and contains a statement indicating the types of collateral or describing the items of collateral. * * A financing statement may be filed before a security agreement is made or before a security interest otherwise attaches." [10]

The Official Comment to the Uniform Commercial Code explains that section 9–402 adopted

" * * * [t]he system of 'notice filing' which has proved successful under the Uniform Trust Receipts Act. What is required to be filed is not, as under chattel mortgage and conditional sales acts, the security agreement itself, but only a simple notice

---

8. The first sentence of this section is taken verbatim from the official text of the Uniform Commercial Code. The two remaining sentences were added when the code was adopted in California.

9. As stated in DuBay v. Williams, supra, 417 F.2d at 1287, n. 7, "The draftsmen's intent was to validate security interests in after-acquired property, including inventory and accounts receivable, and to place such security interests on a

par with security interests in property in which the debtor has present rights. Draftsmen's Comments to U.C.C. § 9–204."

10. Section 9402(5) provides that, "A financing statement substantially complying with the requirements of this section is effective even though it contains minor errors which are not seriously misleading."

which may be filed before the security interest attaches or thereafter. The notice itself indicates merely that the secured party who has filed may have a security interest in the collateral described. Further inquiry from the parties concerned will be necessary to disclose the complete state of affairs. * * * Notice filing has proved to be of great use in financing transactions involving inventory, accounts and chattel paper, since it obviates the necessity of refiling on each of a series of transactions in a continuing arrangement where the collateral changes from day to day." Uniform Commercial Code (U.L.A.) § 9–402; also quoted in California Code Comment on § 9402.

The financing statement executed by the parties reads in pertinent part:

7. This FINANCING STATEMENT covers the following types or items of property (if crops or timber, include description of real property on which growing or to be grown)

Sales and service of new and used automobiles

7A. Maximum amount of indebtedness to be secured at any one time (OPTIONAL).

$_____

8. Check if Applicable
A [X] Proceeds of collateral are also covered
B [X] Products of collateral are also covered
C [X] Proceeds of above described original collateral in which a security interest was perfected
D [X] Collateral was brought into this State subject to security interest in another jurisdiction

[A3601]

This financing agreement was filed as required by law. The various security agreements enumerated above described with particularity the automobiles involved. The bank was readily available and upon inquiry could have supplied complete details from the security agreements.

■ Was the description "sales and service of new and used automobiles" sufficient to constitute a valid "financing statement" and put third parties on notice that the bank might have a security interest in the automobiles? More specifically, did the security agreements reasonably identify "what is described" within the meaning of section 9110 and did the "financing statement" contain "a statement indicating the types of collateral" as required by section 9402? [11]

In my opinion the words "new and used automobiles" were sufficient to describe the type of property or collateral covered by the security agreements. The addition of the words "sales and service" simply described the type of business conducted by the bankrupt. Construing the automobile dealer agreement, financing statement, and security agreements together, it is clear that the parties contemplated inventory financing of new and used automobiles. The description in the financing statement was sufficient to put a prudent examiner upon further inquiry.[12]

11. It is clear that the conditional sales contracts and flooring agreements reasonably identified the automobiles. Plaintiff contends, however, that the financing statement does not comply with either section 9110 or 9402.

12. In re Excel Stores, Inc., 2 Cir. 1965, 341 F.2d 961, 963, refers to the "scrapping of the old statutory scheme, which varied from State to State, and the substitution for it of the filing of a simple notice which is only to 'give the minimum information necessary to put any searcher on inquiry.' " See also In re Colorado Mercantile Co., D.Colo.1969, 299 F. Supp. 55, 58.

Examples of general descriptions held sufficient to give adequate notice and perfect a security interest include "Motor Vehicles", Bank of Utica v. Smith Richfield Springs, Inc., 1968, 58 Misc.2d 113, 294 N.Y.S.2d 797, 799; "Inventory and accounts receivable", In re Platt, E.D.Pa.1966, 257 F.Supp. 478, 481; "Accounts Receivable", South County Sand & Gravel Co. v. Bituminous Pavers Co., R.I.1969, 256 A.2d 514, 516–517.

In re Lehner, D.Colo.1969, 303 F.Supp. 317, holds that a description of "consumer goods" was insufficient.[13] That opinion, however, is not inconsistent with other cases and the conclusion here that a broad and general description of a type of property is sufficient. Rather it tends to support the conclusion in this case. The court said in part:

" * * * Professor Gilmore has indicated that:

'A filed financing statement must describe the types of collateral in which the secured party claims, or may claim, an interest. The description by "types" is understood to require a certain degree of specificity: it would not be sufficient for the notice to claim "all the debtor's property." Thus if a secured party is financing a dealer's inventory which includes washing machines, television sets, phonographs, radios and refrigerators, it would be advisable for the notice to list each of these "types" of collateral separately. Gilmore, Security Interests in Personal Property § 15.3, at 477 (1965).'

Professor Honnold also interprets § 9–402 as requiring more than a mere statement that the collateral consists of inventory, equipment, or consumer goods:

'To perform its function of public notice the financing statement must (9–402) give several items of information not required in the security agreement (e. g. the address of the secured party and the debtor); on the other hand the goods need not be "described"; UCC 9–402(1) provides that "indicating the *types*" will suffice (e. g. "Motor vehicles.") J. Honnold, Law of Sales and Sales Financing 507 (University Casebook Series 1968).'

"One case has held that the requirements of 9–402 are satisfied by providing in the financing statement that the collateral consists of 'Inventory and Accounts Receivable.' In re Platt, 257 F.Supp. 478 (E.D.Pa.1966). There, however, the court relied on the fact of commercial policy applicable to inventory financing which discourages the filing of new statements each time new inventory and accounts receivable are acquired—a consideration which is not present in an individual loan case like the present one." p. 319.

The holding of In re Platt is applicable here.

Plaintiff relies primarily upon Mammoth Cave Production Credit Ass'n v. York, Ky.1968, 429 S.W.2d 26, 29, where the Court of Appeals of Kentucky held that a description of "all farm equipment" was too general and vague. The court commented that "[t]he description is studiously designed to cover everything and describe nothing."[14]

While this case lends some support to plaintiff's position, it is clearly distinguishable. First, the words "all farm equipment" are less descriptive of the type of property than "new and used automobiles." Second, the words "all farm equipment" were used in the security agreement, as well as in the financing statement. The court's opinion centered on the lack of specificity in the

---

13. In re Lehner involved a single loan secured by a tapedeck and speaker and a portable television. The financing statement simply described the collateral as "consumer goods."

14. The court suggested that this description could "include anything from a screwdriver or garden hoe to the largest machinery."

security agreement. In the instant case there is no question that the property was described with particularity in the security agreements. The other cases cited infra upholding the validity of the security interests are more persuasive and factually more nearly in point.

■ Without citation of supporting authority, plaintiff argues that the six conditional sales agreements covering the demonstrators (Ex. A 1 to 6), in which the bankrupt signed as both buyer and seller could not constitute valid security agreements. In each case, however, the debtor had "signed a security agreement" containing "a description of the collateral" (§ 9203). There was an agreement that the security interest attach, value was given and the debtor had rights in the collateral (§ 9204). The agreements had been delivered to the bank as the "secured party" and the agreements provided for installment payments at the bank. The security interest was held by the bank and not by the bankrupt.[15] Upon inquiry at the bank a third party would have learned of the security interest.

■ Plaintiff next contends that the financing statement was inadequate to cover property acquired subsequent to its filing. It is true, as plaintiff argues, that the words "after-acquired property" do not appear in the financing statement. This does not preclude a valid security interest in the after-acquired property. In Bank of Utica, supra, 294 N.Y.S.2d at 799, the court noted that "[a]dding the words 'after-acquired' to the description of the collateral may be advisable, but it is not required and in this case particularly, it is difficult to see what it would have added. The

debtor was a retail automobile agency. Obviously, it was buying and selling motor vehicles in the pursuit of that business." Descriptions such as "Inventory and accounts receivable" have been held to include after acquired property by the very character of the type of collateral designated. See South County Sand and Gravel Co., supra, 256 A.2d at 517; In re Platt, supra, 257 F.Supp. at 481; Evans Products Co. v. Jorgensen, 245 Or. 362, 421 P.2d 978, 981 n. 3.

As in Bank of Utica, supra, it is obvious here that the debtor was a retail automobile agency engaged in buying and selling new and used automobiles. The addition of the words "sales and service" indicates even more clearly a continuing financing arrangement with a floating lien over the inventory of the debtor.

■ It is stipulated that the defendant obtained possession of the property "on account of balances due prior to August 15, 1967." Construing all of the documents together, and particularly the provisions of the dealer agreement, it is apparent that the security interests should be viewed as secured by a single entity, a floating lien.[16] While each contract was evidenced by a specific promissory note, there was a single debt covered by the security interest even though the items of property changed from time to time. Under section 9108 the security interest of the bank, upon the acquisition of each specific item of property by the debtor, would be deemed to have been made for new value rather than as security for an antecedent debt and hence would not be a preferential transfer. See Rosenberg v. Rudnick, D.

15. Exhibits A 1 to 6 contain the first page of the contracts and a notation "continued on reverse." Exhibit U 1 is a copy of one of the contracts with the second page, which shows an assignment from the bankrupt to Southwest Bank with a guaranty with recourse.

16. The Official Comment on Section 9–204 of the Uniform Commercial Code states that, "This Article accepts the principle

of a 'continuing general lien' * * * " and "rejects the doctrine * * * that there is reason to invalidate as a matter of law what has been variously called the floating charge, the free-handed mortgage and the lien on a shifting stock." See also Annotation on Commercial Code —"Security Interest", 11 A.L.R.3rd 1231, and particularly § 4—"Arrangements for financing motor vehicle dealer", at 1237.

Mass.1967, 262 F.Supp. 635, 639. Valid security interests attached and were perfected prior to the filing of the petition in bankruptcy. See In re United Thrift Stores, Inc., D.N.J.1965, 242 F. Supp. 714, 717.

■ A perfected security interest in after-acquired property is not a voidable preference within the meaning of Section 60a of the Bankruptcy Act. In Du Bay, supra, after a detailed analysis of Section 60a and its relationship to the Uniform Commercial Code, the court concluded that where a creditor "filed its financing statement long before the four-month period anteceding bankruptcy, its security interest is immune from the trustee's preference challenge." The court continues, "the intent of the draftsmen of the Uniform Commercial Code [was] to make security transactions conform to the legitimate needs of commerce, rather than to the common-law lawyer's wish for conceptual nicety." 417 F.2d at 1288, 1289.

■ Finally, plaintiff contends that the financing statement makes no reference to the dealer's reserve accounts and accordingly these accounts do not constitute a security interest within the meaning of the California Commercial Code. There is of course no question that the reserve accounts were accumulated as a part of the security transaction pursuant to the automobile dealer agreement, which provided that upon discontinuance of business the bank could retain the balances until the debtor's "obligations are satisfied." Whether or not they were specifically covered by the financing statement, we agree with defendant that it had a right of set-off under its so-called banker's lien.

Section 3054 of the California Civil Code provides in part: "A banker has a general lien, dependent on possession, upon all property in its hands belonging to a customer, for the balance due to him from such customer in the course of the business." In construing this section in the case of Goggin v. Bank of America Nat'l Trust & Sav. Ass'n, 9

Cir. 1950, 183 F.2d 322, 22 A.L.R.2d 470, cert. denied, 1950, 340 U.S. 877, 71 S.Ct. 122, 95 L.Ed. 637, the court held that a banker's lien under section 3054 could be used to set off proceeds received through collections against loans made to the debtor. The court said in part:

"The theory of the law is that a bank extends credit and accommodations to its customer in reliance upon the expectation that such paper will, from time to time, come into its possession and become available to it as security or offset. * * *

"This doctrine [the banker's lien] is not dependant solely upon any express agreement, but arises by implication growing out of the relationship of the depositor and the bank. * * * Since the lien is given upon the theory that any credit the bank extends to its customer by way of loan or overdraft is given on the faith that money or securities sufficient to meet the debt at its maturity will come into the possession of the bank to discharge the same, of course, in such a case no express agreement is necessary." Id. at 324–325 n. 2, 22 A.L.R.2d at 475 n. 2.

In holding further that the exercise of a banker's lien within four months was not a voidable preference, the court continued:

"Appellant finally contends that the effect of a banker's lien, if allowed in the circumstances obtaining here, would be a secret lien and preference contrary to the intent of Section 60, sub. a of the Bankruptcy Act. * * But, Section 67, sub. b of the Bankruptcy Act * * * expressly excepts statutory liens from the operation of Section 60, sub. a. * * *" Id. at 327.

The court concludes: (1) that defendant had a perfected security in the automobiles which were repossessed and sold; (2) that defendant had a right under its banker's lien to set off the balances remaining in the reserve accounts; and (3) that the property and

credits received by the defendant did not constitute a voidable preference under the Bankruptcy Act.

Judgment will be entered for the defendant.