James J. BIGGINS, Jr., as Trustee for Peterson Ford, a California corporation, Plaintiff/Appellant,

v.

SOUTHWEST BANK, a California corporation, Defendant/Appellee.

No. 71–2721.

United States Court of Appeals, Ninth Circuit.

Dec. 7, 1973.

Rehearing Denied Jan. 28, 1974.

William O. Ward, III, Woolley, Crake, Collins & Ward, San Diego, Cal., for plaintiff/appellant.

Leonard A. Goldman, Goldman & Arnold, Los Angeles, Cal., Weil & Fritz, Whittier, Cal., for defendant/appellee.

Before CHAMBERS and CHOY, Circuit Judges, and LUCAS,* District Judge.

LUCAS, District Judge:

This is an appeal by a trustee in bankruptcy from an adverse decision rendered by the district court sitting under its original jurisdiction over all matters and proceedings in bankruptcy. Jurisdiction lies with this Court under 11 U.S.C. § 47.

The facts were stipulated to at trial, and were set forth by the district court. *See* 322 F.Supp. 62, 63–64 (S.D.Cal., 1971). For purposes of this discussion, those facts presented by the district will be summarized as follows.

Appellant, as trustee for the bankrupt, Peterson Ford, brought an action against Southwest Bank under section 60 of the Bankruptcy Act, 11 U.S.C. § 96, seeking to recover the value of property and credits allegedly taken and received from Peterson Ford as voidable preferences in relation to other creditors of the same class. Southwest Bank claims that it is entitled to the property and credits by reason of a perfected security interest under the California Commercial Code, and by reason of a banker's lien exercised under the common law.

Peterson Ford, a retail automobile dealer, was a customer of Southwest Bank, which financed the former's sales and service of new and used cars. On October 10, 1966, Peterson Ford and Southwest Bank entered into an "Automobile Dealer Agreement," whereby the latter agreed to purchase "such conditional sales contracts from Dealer covering the sale of motor vehicles as are acceptable to Bank at agreed rates of discount." The agreement provided that "[e]ach contract shall be assigned and guaranteed by Dealer in form satisfactory to Bank," and that the purchase price of each contract "shall be paid to Dealer or credited to his account when the contract is purchased and thereupon full title to the contract shall pass to Bank." The agreement required that a dealer reserve account be deposited with Bank and maintained at an amount equal to three percent of the total value of chattel paper negotiated through the bank.

On December 6, 1966, a "Financing Statement" was executed by Peterson Ford, as "debtor," and Southwest Bank, as "secured party," and was presented for filing pursuant to the California Commercial Code on December 12, 1966. This financing statement covered "[s]ales and service of new and used automobiles," and was signed, and filed, in compliance with section 9402 of the Commercial Code. Various conditional sales contracts and flooring agreements were executed by Peterson Ford, and assigned to Southwest Bank subsequent to the execution of the agreement and the filing of the statement. Peterson Ford and Southwest Bank also concluded a chattel mortgage covering equipment, furniture and fixtures, and a guarantee covering all indebtedness which Peterson Ford "may now or at any time hereafter owe" Southwest Bank to the extent of $30,000.00 as applied to "wholesale flooring only."

Pursuant to a voluntary petition, Peterson Ford was adjudged a bankrupt on December 15, 1967. The parties stipulated in the pretrial conference order that, on or after August 15, 1967, a period within four months of bankruptcy, Southwest Bank obtained possession of certain property "on account of balances due prior to August 15, 1967." The description of property listed 29 automobiles with dates of transfer between August 16, 1967 and October 14, 1967.

* The Honorable Malcolm M. Lucas, United States District Judge, Central District of California, sitting by designation.

Seven automobiles were listed twice, with different dates of transfer during this period. The description also listed certain property described as "Peterson Ford Dealer Reserve Accounts," with "transfers occurring on almost a daily basis since August 15, 1967." Sixteen of the 22 automobiles (the latter figure accounts for the double listing of the seven automobiles in the figure of 29) were listed in various agreements entitled "Security Agreement—Flooring." A flooring agreement would grant to Southwest Bank a security interest in the collateral described therein, and in all proceeds of its sale for the payment of a promissory note of the same date. The various flooring agreements at issue described from one to eight automobiles. (The seven double listed automobiles were described in agreements dated subsequent to August 15, 1967.)

Six of the 22 automobiles were listed in individual conditional sales contracts, three dated December 9, 1966 and three dated December 19, 1966. These conditional sales contracts referred to Peterson Ford as both the seller and the buyer, and required the dealer to make financing payments at its account with Southwest Bank in twelve successive monthly installments. The six automobiles covered in these conditional sales contracts were utilized as demonstrator models for Peterson Ford.

The parties presented a variety of questions for review. These questions may be formulated as follows:

(1) whether the "Financing Statement" of December 6, 1966 (listing "[s]ales and service of new and used automobiles") sufficiently described the subject collateral to comply with the notice requirements of a security interest as to third parties under the California Commerical Code; .

(2) whether the transfer of the after-acquired collateral in the form of the 16 automobiles subject to the flooring security agreements can be successfully defended against a trustee in bankruptcy as property subject to a prior perfected security interest;

(3) whether a valid security interest was created under the circumstances of this case whereby the debtor signed a conditional sales contract as both the seller and buyer of the secured property, and became obligated to make payments in favor of an account established at the secured party's place of business;

(4) whether Southwest Bank had the power to exercise its common law right of set-off of a preexisting obligation against a trustee in bankruptcy, within four months of bankruptcy, with respect to the dealer reserve account established to secure payment of said obligation.

The applicable provision of the Bankruptcy Act, and this Court's summarization of said provision in DuBay v. Williams, 417 F.2d 1277, 1286–1287 (9th Cir., 1969), and the purpose of Division 9 of the California Commercial Code were adequately presented by the district court. See 322 F.Supp. at 64–65. Relevant portions of *DuBay* and Division 9 will be raised subsequently. For purposes of treating the first question on review, it is necessary to focus upon two provisions of Division 9 of the Commercial Code, specifically sections 9402 and 9110.

Section 9402 provides, inter alia, that:

(1) A financing statement is sufficient if it is signed by the debtor and by the secured party, gives the name and mailing address of the secured party, the name and mailing address of the debtor and contains a statement indicating the types of collateral or describing the items of collateral.

Only the most basic description of property deemed to be collateral for an Article 9 security interest was contemplated insofar as it might indicate to an interested third party that possible prior encumbrances might exist with respect to prospectively contemplated collateral. Only a "simple notice" was required by

this section. Uniform Commercial Code § 9–402, Comment 2.

This reasoning is borne out by related provisions of the Commercial Code. Section 9110, which as an integrated element of Division 9 should be read in conjunction with section 9402, provides, inter alia, that:

> For the purposes of this division any description of personal property or real estate is sufficient whether or not it is specific if it *reasonably identifies* what is described. Personal property may be referred to by general kind or class if the property can be *reasonably identified* as falling within such kind or class or if it can be so identified when it is acquired by the debtor. (emphasis added)

The Code thus contemplates no fine distinctions of form as to descriptive language identifying property subject to a Division 9 security interest. It merely looks to the substance of the transaction, and the ordinary and common meaning to be attached to that which the parties contemplate as the encumbered object. Section 9402 was expressly conceived to dispense with the former requirement of detailed, particularized descriptions of collateral which inevitably fostered formal disputes over meanings and interpretations. *See* Uniform Commercial Code § 9–402, Comments 1, 2 and 5.

In this context, the trustee's arguments are premised on that which the Code specifically rejects—a nonconstructive exercise in semantics. The attempt to apply extensive textual analysis to the phrase "[s]ales and service of new and used automobiles," in an effort to demonstrate that inventory financing within the plain and simple terms of the usage of trade was not contemplated, is not consistent with the overall purpose of the Code. *See* Cal.Comm.Code §§ 1102 and 1205 (West 1964). In light of sections 1102 and 1205, these arguments are frivolous. On another argument, addressing itself to the first question presented for review, the trustee is equally incorrect. He suggests that the description of collateral is insufficient on its face within the financing statement, and that an interested third party should not have to refer to all the documents comprising the security interest to ascertain the encumbered property. The notice premise of Division 9 has been previously discussed. Under the Code, an interested third party has the burden of continuing his investigation as to prior perfected security interests which may affect the proposed collateral for his particular agreement with the debtor. In this sense, the financing statement's purpose is to merely alert the third party as to the need for further investigation, never to provide a comprehensive data bank as to the details of prior security arrangements. *See* In re Richards, 455 F.2d 281, 282–284 (6th Cir., 1972); In re Platt, 257 F.Supp. 478, 481 (E.D.Pa., 1966); *cf. DuBay, supra* 417 F.2d at 1284–1285 (memorandum merely designating accounts without formalities of signatures deemed insufficient against trustee in bankruptcy).

Accordingly, the district court was correct in concluding that "[c]onstruing the automobile dealer agreement, financing statement, and security agreements together, it is clear that the parties contemplated inventory financing of new and used automobiles." 322 F.Supp. at 67. The description of property set forth in the financing statement was sufficient notice as to a Division 9 security interest under the California Commercial Code such that an interested third party could have, with further inquiry, adequately determined prior perfected security interests affecting any prospective collateral.

The second issue raises the more narrow question of the validity of a security interest with respect to after-acquired property under Division 9 in the face of a voidable preference challenge contemplated by section 60 of the Bankruptcy Act. The source for the after-acquired property concept is found within the language of section 9204 of the

Code. This section provides, inter alia, that:

(1) A security interest cannot attach until there is agreement (subdivision (3) of Section 1201) that it attach and value is given and the debtor has rights in the collateral. It attaches as soon as all of the events in the preceding sentence have taken place unless explicit agreement postpones the time of attaching.

Thus, supplemental agreements pertaining to the changing character of dealer inventories can be dispensed with unless, of course, the parties otherwise stipulate in their agreement.

Section 9204 further provides:

(3) Except as provided in subdivision (4) [pertaining in limited instances to consumer goods and replacements as additional security which are not at issue here] a security agreement may provide that collateral, *whenever acquired*, shall secure all obligations covered by the security agreement. (emphasis added)

This is an express sanctioning of the concept of the floating lien as it may be applied as a security device with respect to a debtor's present *and future* assets. *See* Uniform Commercial Code § 9–204, Comment 3; *see also* Cal.Comm.Code § 9110 (West 1964).

■ More specifically, the trustee takes issue with the adequacy of the description of the after-acquired property involved in this case under the Code. In essential respects, this contention has been previously dealt with by the immediately preceding discussion. All the documents read in conjunction with each other, a practice intended by the draftsmen of the Code, would certainly support the conclusion that after-acquired inventory financing was contemplated by the parties. The absence of the term "inventory" itself is not deemed to be fatal to the inclusion of same within the four corners of the security interest. "Inventory" is defined, inter alia, as

goods "held by a person who holds them for sale or lease." Cal.Comm.Code § 9109(4) (West 1964). Thus, the commercially reasonable description of the collateral contained within the financing statement at issue is equivalent to the definition of "inventory" as set forth in the Code. *See also* In re Fibre Glass Boat Corp., 324 F.Supp. 1054 (S.D.Fla., 1971); In re Nickerson & Nickerson, Inc., 329 F.Supp. 93 (D.Neb., 1971).

■ Insofar as such a prior perfected security interest in after-acquired property raises a question as to its validity in the face of a voidable preference challenge from a trustee in bankruptcy, this Court has previously considered such a question in *DuBay, supra,* and has resolved it in favor of the Division 9 security interest. In that case, this Court commented

Nothing in the legislative history of section 60a(2) suggests that Congress intended to permit a trustee to upset floating liens on accounts receivable, which, as here, were automatically perfected and which involved none of the symptoms of last minute favoritism characterizing true preferences. On the contrary, the history of the section shows that Congress knew how important accounts receivable financing was to the business community, particularly to small-business men, and one of Congress' principal objectives in amending section 60a(2) was to loosen the flow of credit to small-business men whose financing had been seriously impaired by the old bona fide purchaser test. 417 F.2d at 1289.

Applying the two-fold test discussed at length in *DuBay* to the facts of the instant case, this Court concludes that a section 60a(2) "transfer" occurred when Southwest Bank "so far perfected" its "transfer of property" from Peterson Ford that no subsequent lien creditor could achieve a higher priority as to the subject property, and that said perfection occurred on the date upon which

Southwest Bank filed its financing statement, which was December 12, 1966—roughly one year prior to bankruptcy. *See* 417 F.2d at 1287–1288.

■ Accordingly, the after-acquired inventory contemplated within the financing statement was sufficiently described therein so as to provide notice to any potential subsequent lien creditors, and the financing statement's filing on the aforementioned date perfected the security interest within a sufficient period of time to enable it to withstand the trustee in bankruptcy challenge instituted in this case.

■ The third question presented for review raises the validity of the purported security interests created in the six automobiles pursuant to individual conditional sales agreements, which automobiles the district court found to be utilized as demonstrator models. Thus, the financing for these particular automobiles would *appear* to be of a different character than the remaining sixteen automobiles at issue, which were listed in various flooring security agreements. (The latter automobiles clearly fell within the coverage of the inventory financing security device contemplated by the October 1966 agreement, which was perfected by the filing of the December 1966 financing statement. *See* discussion, *infra.*) This particular question appears to raise novel issues for this Court, specifically concerning the precise nature of the Division 9 security device created with respect to these demonstrator models, and the factor of what additional measures, if any, were required to be taken in order to perfect that security device. The district court based its analysis on the language contained within sections 9203 and 9204 of the Code as applied to the facts, noting that the conditional sale agreements designated Southwest Bank as the "secured party," and that they were delivered to the latter where, presumably, an interested third party could upon appropriate inquiry ascertain the subject encumbrances. This conclusion is correct, and we so hold.

Other provisions within Division 9 appear to be pertinent to the particular facts of the case involving security interests in the same collateral. Section 9303 of the Code provides in part:

(1) A security interest is perfected when it has attached and when all of the applicable steps required for perfection have been taken. Such steps are specified in Sections 9302, 9304, 9305 and 9306. If such steps are taken before the security interest attaches, it is perfected at the time when it attaches.

(2) If a security interest is originally perfected in any way permitted under this division and is subsequently perfected in some other way under this division, without an intermediate period when it was unperfected, the security interest shall be deemed to be perfected continuously for the purposes of this division.

\*　\*　\*　\*　\*　\*

(4) If a security interest in goods is perfected in accordance with this division, such security interest does not become unperfected by reason of a subsequent change in the use to which the goods are put. . . .

(Subdivision (4), along with subdivision (3), of section 9303 is peculiar to the California Commercial Code, and does not appear in section 9–303 of the Uniform Commercial Code.) "These provisions were added to settle any question which might be raised as to the effect of the change in the use of the property after the security interest attaches." California Commercial Code § 9303, Comment 4. Thus, if the "successive stages" of the secured party's security interest succeed one other "without an intervening gap, the security interest is 'continuously perfected' and the date of perfection is when the interest first became perfected," which, in the instant

case, would be when the December 1966 financing statement initially referred to Peterson Ford's inventory, by implication, in describing the sales and service of new and used cars as the collateral subject to a prior security interest, from which inventory derived the six demonstrator models subjected to the supplementary purchase money security interests. *See* Uniform Commercial Code § 9–303, Comment 2.

This analysis is supported elsewhere in the Commercial Code. Section 9306 provides in part:

> (1) "Proceeds" includes whatever is received when collateral or proceeds is sold, exchanged, collected or otherwise disposed of. The term also includes the account arising when the right to payment is earned under a contract right. Money, checks and the like are "cash proceeds." All other proceeds are "noncash proceeds."

The disposition of the six automobiles (originally contemplated as inventory collateral within the original security device) under the six conditional sales agreements altered their collateral status, in theory at least, such as to create a new account which, in this case, happened to be located with the same person who had obtained the prior security interest in the original collateral. (Obviously, this analysis would be less complicated if in fact the succeeding secured party had been a different person from the predecessor secured party, but in this case both were Southwest Bank, first under the inventory security agreement, and then under the conditional sales agreements.) Section 9306 continues:

> (3) The security interest in proceeds is a continuously perfected security interest if the interest in the original collateral was perfected but it ceases to be a perfected security interest and becomes unperfected 10 days after receipt of the proceeds by the debtor unless

> (a) A filed financing statement covering the original collateral also covers proceeds. . . .

The financing statement filed in December 1966 perfected a security interest in the inventory collateral set forth within the description, *and* in the "[p]roceeds of [the] above described original collateral in which a security interest was perfected." Therefore, any proceeds received in exchange for the disposition of the original collateral, including that which was received in exchange for the conditional sales agreements pertaining to the six demonstrator models, was subjected to the continuously perfected security interest established in the original inventory collateral by the financing statement. The end result thus created a second security interest (a purchase money security interest) in favor of Southwest Bank, as the secured party, which, however, was subordinated to the prior security interest in the inventory collateral which continued notwithstanding the conditional sales agreements' dispositions.

The fourth and final question presented for examination pertains to the status of the dealer reserve account under the Commercial Code, and raises the issue whether Southwest Bank had the power to exercise its right of set-off under the common law.

■ It is clear that the parties contemplated that the dealer reserve account was to be considered part and parcel as part of the property within which the secured party, Southwest Bank, had its security interest. Since this security agreement, contemplating said dealer reserve account as collateral in part securing the inventory financing, was given public notice by a duly filed financing statement, which perfected said security interest in the inventory, the problem of perfection of "general intangibles" under section 9302(1)(g) of the Commercial Code is avoided. *See* Nunnemaker Transp. Co. v. United California Bank, 456 F.2d 28, 32–34 (9th Cir., 1972).

**1312**

With respect to the purported banker's lien found exercised by the district court, the dealer reserve account envisaged as collateral pursuant to the October 1966 security agreement was from its very inception viewed as an integrated part of the commercial collateral securing Peterson Ford's inventory financing of new and used automobiles. Accordingly, within the meaning of the Commercial Code, the dealer reserve account was never contemplated as that which would be subject to a right of set-off inasmuch as its commercial character was clear and totally embraced within the concept of the Division 9 security interest. Therefore, the argument that a banker's lien was invalidly implemented is rejected inasmuch as that which was taken was subjected to collateral status as part of a prior perfected Division 9 security interest. Furthermore, the security interest created was a statutory supplement to whatever remedies Southwest Bank had at common law. And as a valid statutory supplement, the Division 9 security interest was an enforceable statutory lien expressly exempted from the application of section 60 of the Bankruptcy Act. *See* 11 U.S.C. § 96(b). Thus, we deem it unnecessary to reach any alleged constitutional problems of deprivation of property without notice.

Accordingly, since Southwest Bank and Peterson Ford contemplated the dealer reserve account as an integrated element of the collateral securing the inventory financing agreement, and since it was duly perfected by the proper filing of the December 1966 financing statement, which served notice as to the existence of said agreement, therefore, a prior perfected security interest existed in that account which Southwest Bank could deem forfeited and duly transferred upon the failure of the security agreement's conditions.

The district court's decision is affirmed, as modified by the above discussion.