In re MORRISTOWN LINCOLN–MERCURY, INC., Debtor.

FIRST STATE BANK, Plaintiff,

v.

MORRISTOWN LINCOLN–MERCURY, INC., Richard Stair, Jr., Trustee, and Bank of Commerce of Morristown, Tennessee, Defendants.

and

Richard STAIR, Jr., Trustee, Third-Party Plaintiff,

v.

HAMILTON BANK OF MORRISTOWN and Ford Motor Credit Company, Third-Party Defendants.

Bankruptcy No. 3–81–01889.
Adv. No. 3–82–0306.

United States Bankruptcy Court, E.D. Tennessee.

Feb. 23, 1983.

Morrison, Morrison & Morrow, Kenneth E. Morrow, Knoxville, Tenn., for plaintiff.

Stone & Hinds, P.C., George F. Legg, Knoxville, Tenn., for third-party defendant Ford Motor Credit Co.

## MEMORANDUM

CLIVE W. BARE, Bankruptcy Judge.

At issue is the priority of two competing claims to a dealer reserve account maintained by Ford Motor Credit Company (Ford Credit) in conjunction with its former association with the debtor automobile dealership, Morristown Lincoln-Mercury, Inc. The reserve account consists of funds withheld by Ford Credit contemporaneously with its purchase of retail installment contracts from the debtor. Plaintiff First State Bank (Bank) contends the account represents an account receivable, contract right, or general intangible, Tenn.Code Ann. § 47–9–106 (1979), of the debtor subject to its security interest perfected on February 18, 1981. Denying the account represents either a contract right or general intangible, Ford Credit contends the funds in the account are proceeds, Tenn.Code Ann. § 47–9–306 (1979), from the sales of automobile inventory subject to its purportedly previously perfected security interest of July 27, 1964. Two alternative arguments are also offered by Ford Credit: (1) the controverted fund is an account receivable subject to a security interest of Ford Credit perfected previous to the creation of the Bank's security interest; (2) the controverted fund is money in which only Ford Credit has a perfected security interest since it has possession of the account funds.[1]

## I

The facts under which the competing interests of the plaintiff Bank and Ford Credit arose are undisputed. Morristown Lincoln-Mercury, Inc. filed its chapter 11 bankruptcy petition on December 17, 1981. Four weeks thereafter the debtor's case was converted to chapter 7. The debtor's ordinary course of business included the sale of new and used inventory motor vehicles. Ford Credit provided financing for the debtor's customers, from time to time, by purchasing retail installment contracts from the debtor for the amount due under the customer's contract less a discount. Additionally, pursuant to its financing agreement with the debtor, Ford Credit withheld three percent (3%) of the purchase proceeds due the debtor and deposited the withheld funds in a separate and distinct "Dealer Proceeds Withheld Account." The purpose

1. This adversary proceeding was commenced when First State Bank filed its complaint requesting an abandonment by the trustee in bankruptcy of twenty-five motor vehicles and other collateral allegedly subject to the Bank's prior security interest. The original defendants were Bank of Commerce of Morristown, Morristown Lincoln-Mercury, Inc., and Richard Stair, Jr., trustee in bankruptcy. When the trustee discovered Ford Motor Credit Company and Hamilton Bank of Morristown had filed financing statements claiming security interests in some of the same property claimed as collateral by the Bank, the trustee filed a third-party complaint naming Ford Motor Credit Company and Hamilton Bank of Morristown as third-party defendants. A judgment adjudicating the rights of the competing secured parties and the trustee in bankruptcy was entered by this court on July 27, 1982. However, the court specifically reserved determination with respect to the rights of Ford Motor Credit Company to the dealer reserve account proceeds at issue herein and to $1,099.28 in cash proceeds until a further hearing upon the request of any party. Ford Credit filed a motion on October 4, 1982, requesting a hearing to determine the priority and extent of its security interest in the dealer reserve account proceeds. Decision was reserved after trial of the issue on November 30, 1982. The parties have had an opportunity to brief the issues, and the court is prepared to enter its decision. Presumably, an agreement was reached with respect to the $1,099.28 in cash proceeds since no party has requested a determination by the court of the right to those funds.

of this reserve account was to provide security for all obligations of the debtor to Ford Credit and its subsidiaries. The balance of the account was $39,177.15 when the debtor's bankruptcy petition was filed. Despite the liquidation of other collateral, the claims of the Bank and Ford Credit against the debtor's estate each exceed the balance in the "Dealer Proceeds Withheld Account."

In consideration for the Bank's $500,-000.00 loan, the debtor executed its note and a combined financing statement and security agreement, dated November 10, 1980. Debtor granted the Bank a security interest in its machinery, equipment, inventory, raw materials then owned or thereafter acquired and in

> [a]ll accounts receivable, accounts, notes, drafts, acceptances, and other forms of obligations and receivables now or hereafter received by or belonging to Debtor for goods sold by Debtor . . . and all rights of the Debtor earned or yet to be earned under contracts to sell, or to render services, or any other contract rights, choses in action or general intangibles, of every kind whatsoever.

The debtor warranted the collateral offered was absolutely owned by the debtor, free and clear of any lien or other encumbrance.

The financing statement actually filed by the Bank with the Tennessee Secretary of State on February 18, 1981, recites in part:

> This financing statement covers the following types (or items) of property: All machinery, equipment (excluding licensed motor vehicles), furniture and fixtures; all inventory parts, all accounts receivable, including contract rights, and general intangibles; now owned, to be acquired, and hereafter acquired.

The validity of the documents supporting the secured claim of the Bank is not at issue.

Ford Credit relies upon several agreements to support its claim of priority to the funds in the reserve account. Without ex-

ception, the agreements relied upon by Ford Credit predate both the execution of the Bank's combined financing statement and security agreement and the recordation of its financing statement.

An application for financing, dated August 2, 1962, submitted by the debtor to Ford Credit provides in material part: "[Ford Credit] shall, at all times, have a right to offset and apply any and all credits, monies or properties of [Morristown Lincoln-Mercury, Inc.] in [Ford Credit's] possession or control against any obligations of [Morristown Lincoln-Mercury, Inc.] to [Ford Credit]." A statement of trust receipt financing, identifying Ford Credit as an entruster and the debtor as trustee, was filed with the Tennessee Secretary of State on September 7, 1962.

The original UCC financing statement from the debtor to Ford Credit was recorded on July 27, 1964, in the office of the Tennessee Secretary of State. The statement covers:

> New and used motor vehicles, tractors, trailers, semi-trailers, mobile homes, farming implements . . . and equipment and accessories or replacement parts of any of the above.
>
> Chattel paper.
>
> Automotive service parts and accessories and all other inventory.
>
> *Accounts* receivable and *factory credits.* (Emphasis added).

Notably, the financing statement does not cover either contract rights or general intangibles. The statement does provide that proceeds of collateral are covered. Continuation statements have been timely filed to continue the effectiveness of the original financing statement.[2] However, the evidence in this case does not include a security agreement executed contemporaneously with the original financing statement.

The debtor executed an assignment, dated September 21, 1971, assigning to Ford Credit "[a]ll credits due and to become due

---

**2.** Continuation statements complying with the requirements of Tenn.Code Ann. § 47–9–403(4) (Supp.1982) were timely filed by Ford Credit on

the following dates: May 28, 1969; May 2, 1974; June 21, 1979.

to [Morristown Lincoln-Mercury, Inc.] from Ford Motor Company or any of its subsidiaries or affiliates." Ford Credit is a subsidiary of Ford Motor Company.

A wholesale security agreement, dated September 28, 1973, executed by the debtor's attorney-in-fact in favor of Ford Credit has also been submitted as evidence. This agreement recites in relevant part:

> As security for the payment of all such advances [for wholesale financing] heretofore and hereafter made, and for the observance and performance of all other obligations of [Morristown Lincoln-Mercury, Inc.] to Ford Credit in connection with the wholesale financing of the Merchandise for [Morristown Lincoln-Mercury, Inc.], [Morristown Lincoln-Mercury, Inc.] hereby grants to Ford Credit a purchase money security interest in the Merchandise, now owned or hereafter acquired, and in the proceeds of any sale or other disposition thereof.

The final documents relied upon by Ford Credit are the 1979 edition of its "Automotive Finance Plans for Ford Motor Company Dealers" and three receipts, acknowledging receipt of a copy of the "Automotive Finance Plans" manual current on the date of the various receipts. (The receipts are dated March 22, 1964, June 17, 1974, and June 15, 1979.) Each receipt provides that all time sale contracts submitted by the debtor to Ford Credit shall be governed by the terms of the retail plan of the manual pertaining to financing plans. The 1979 manual contains the following provision in a section entitled "How Ford Credit Purchases Retail Contracts."

*Purchase Price*

Ford Credit purchases acceptable retail installment contracts from the Dealer at discounts established from time to time by Ford Credit with the Dealer. Ford Credit pays or credits to the Dealer the face value of each contract purchased less Ford Credit's discount charge and any payments that Ford Credit may make for the Dealer for insurance or otherwise. The amount so payable to the Dealer is known as "Dealer Proceeds." *Ford Credit may withhold a portion of the Dealer Proceeds as security for all of the Dealer's obligations to Ford Credit and its subsidiaries.* (Emphasis added).

Periodically, Ford Credit pays to the Dealer (without interest) the amount by which the sum in the Dealer Proceeds Withheld account exceeds a specified amount. If the Dealer substantially discontinues submitting contracts to Ford Credit for purchase, Ford Credit may discontinue payment of the excess in the Dealer's Proceeds Withheld account until all of the Dealer's obligations to Ford Credit and its subsidiaries have been paid in full.

The Bank contends the reserve account represents a contract right of the debtor. This contention appears to be supported by the provision of the 1979 manual entitling the debtor to periodic payments from the dealer reserve account of the excess of the amount specified by the parties as a minimum balance.[3]

As a fundamental position, Ford Credit insists the funds in the reserve account are identifiable proceeds subject to its prior perfected security interest in the debtor's motor vehicle inventory. Secondarily, Ford Credit maintains the reserve account represents an account receivable assigned to it by the debtor under the terms of the September 21, 1971, assignment. Ford Credit contends its previously recorded original financing statement and continuation statements prompted further inquiry, which would have disclosed the assignment interest of Ford Credit in the controverted funds, by an interested party. Thirdly, Ford Credit claims the terms of the debtor's application for financing, dated August 2, 1962, created a security interest in monies of the debtor in its possession. Since it has possession of the funds, Ford Credit contends it is thus the only party with a perfected security interest in the contested fund.

---

3. This amount is not disclosed in the record before the court.

## II

Questions of priority between or among conflicting security interests in the same collateral are governed by Tenn.Code Ann. § 47–9–312 (Supp.1982). The section is inapplicable, however, unless the competing claimants have valid security interests. The initial task of the court, therefore, is to determine whether Ford Credit and the Bank each have a security interest in the funds in the dealer reserve account. Assuming they do, the court must also determine if either party perfected its interest and, if so, when.

Although Ford Credit relies upon several different agreements, the most important of these are the September 21, 1971, assignment and the wholesale security agreement dated September 28, 1973. Significantly, the terms of the assignment assign to Ford Credit "[a]ll credits due and to become due" to the debtor, Morristown Lincoln-Mercury, Inc., from Ford Motor Company or any of its subsidiaries or affiliates. In effect, since Ford Credit is a subsidiary of Ford Motor Company, the assignment creates a security interest in favor of Ford Credit in any credits then currently or prospectively owed by Ford Credit to the debtor. The wholesale security agreement unequivocally granted Ford Credit a security interest in the debtor's merchandise, including after-acquired merchandise, and the proceeds from the sale thereof.

The original financing statement, previously recorded on July 27, 1964, and the May 28, 1969, continuation statement, served to perfect Ford Credit's security interest in the debtor's automobile inventory and proceeds thereof.[4] But, considering the description of the collateral in its previously recorded financing statement, it is questionable whether the security interest of Ford Credit created by the assignment is perfected by filing. However, it is also questionable whether filing by Ford Credit was necessary to perfect the security interest in the credits assigned by the debtor. Tenn.Code Ann. § 47–9–302 (1979) provides in part:

(1) A financing statement must be filed to perfect all security interests except the following:

. . . .

(e) an assignment of accounts or contract rights which does not alone or in conjunction with other assignments to the same assignee transfer a significant part of the outstanding accounts or contract rights of the assignor . . . .

In contrast to the various agreements supporting Ford Credit's interest, the interest of the Bank is quite simple. Its security agreement, in relevant part, encompasses accounts receivable and other forms of obligations, including those after-acquired, and all contract rights or general intangibles of the debtor. The Bank's financing statement, omitting any reference to "other forms of obligations," is more circumspect. Although the Bank does have a security interest in the disputed funds, its interest is unperfected unless the dealer reserve account may be characterized as an account receivable, contract right, or general intangible of the debtor.

In support of its claim to priority, Ford Credit cites *Biggins v. Southwest Bank,* 490 F.2d 1304 (9th Cir.1973). Peterson Ford, an automobile dealership, and Southwest Bank were parties to a financing agreement substantially similar to the agreement between the debtor herein and Ford Credit. Southwest Bank withheld three percent of the total proceeds paid for Peterson Ford's chattel paper and deposited the withheld proceeds in a dealer reserve account maintained at Southwest Bank. Various conditional sales contracts and flooring agreements executed by Peterson Ford were assigned to Southwest Bank pursuant to their previous financing agreement. The flooring agreements granted to Southwest Bank a security interest in the motor vehicles described therein and the proceeds of the sale thereof. The financing statement filed by Southwest Bank covered "[s]ales and

---

**4.** A financing statement is effective even though it is filed before either the execution of a corresponding security agreement or the attachment of a security interest. Tenn.Code Ann. § 47–9–402(1) (1979).

service of new and used automobiles" and the proceeds therefrom. The statement did not expressly cover the dealer reserve account. Within four months of the bankruptcy petition date of Peterson Ford, Southwest Bank debited the dealer reserve account by set-off against antecedent obligations of the bankrupt to Southwest Bank. In an action commenced by the trustee in bankruptcy to recover the value of the offset funds and other property allegedly preferentially transferred, Southwest Bank contended it was entitled to both a statutory banker's lien and a common law right of set-off. The Ninth Circuit concluded the set-off against the dealer reserve account was not preferential because the account was an "integrated element of the collateral securing the inventory financing agreement ... duly perfected by the proper filing of ... [a] financing statement ...." *Biggins v. Southwest Bank,* 490 F.2d at 1312. The court in *Biggins* tacitly determined the funds in the dealer reserve account were proceeds in which Southwest Bank had a perfected security interest.

As previously noted, Ford Credit contends the funds at issue represent proceeds from the debtor's inventory subject to its prior perfected security interest. This contention is based on the following argument. When the debtor sold an automobile from inventory on an installment basis, the debtor received chattel paper from its buyer. The chattel paper represented identifiable proceeds of the sale in which Ford Credit's security interest continued. The discount sale of the chattel paper (representing an installment contract), to Ford Credit by the debtor was also a sale of proceeds. "In that this was a sale of proceeds, the purchase price of the contracts was itself further proceeds identifiable in a chain directly from the sale of the original inventory vehicle in which Ford Credit had a perfected security interest." Post-Trial Brief of Ford Motor Credit Company at 5.

"Proceeds" is defined to include "whatever is received when collateral or proceeds is sold, exchanged, collected or otherwise disposed of." Tenn.Code Ann. § 47–9–306(1) (1979).. And, a security interest generally does continue in any identifiable proceeds when collateral subject to a perfected security interest is sold. Tenn.Code Ann. § 47–9–306(2) (1979). Furthermore, Tenn.Code Ann. § 47–9–306(4) (1979) recites in material part:

In the event of insolvency proceedings instituted by or against a debtor, a secured party with a perfected security interest in proceeds has a perfected security interest:

. . . .

(b) in identifiable cash proceeds in the form of money which is not commingled with other money or deposited in a bank account prior to the insolvency proceedings . . . .

The interest of Ford Credit in the proceeds of the debtor's inventory was perfected. These funds have at all times been in Ford Credit's possession and under its control. Since the filed financing statement covering the original collateral also covers proceeds, Ford Credit's security interest in the proceeds of the debtor's automobile inventory has been continuously perfected since September 28, 1973, a date more than seven years previous to the creation of the Bank's security interest.

Assuming *arguendo* the Bank has a perfected security interest, it appears Ford Credit is entitled to priority because both parties assert perfection by filing and Ford Credit filed first. Tenn.Code Ann. § 47–9–312(5)(a) (Supp.1982). However, Ford Credit's 1973 security agreement only secures the payment of advances made to the debtor in connection with wholesale financing, and there is no differentiation in the record between the wholesale financing and non-wholesale financing claims of Ford Credit. Although it is most improbable that the claims secured by the 1973 wholesale security agreement have been satisfied, the court may not indulge in such a presumption.[5] In any event, the absence of

---

**5.** Ford Credit has filed six proofs of claim and two amended proofs of claim in the debtor's bankruptcy case.

any differentiation is inconsequential to the court's decision because the court substantially concurs in one of the alternative arguments of Ford Credit.

The Bank's assertion of priority is founded upon its contention the dealer reserve account is either an account, contract right, or general intangible of the debtor. Each of these terms is specifically defined:

"Account" means any right to payment for goods sold or leased or for services rendered which is not evidenced by an instrument or chattel paper. "Contract right" means any right to payment under a contract not yet earned by performance and not evidenced by an instrument or chattel paper. "General intangibles" means any personal property (including things in action) other than goods, accounts, contract rights, chattel paper, documents and instruments.

Tenn.Code Ann. § 47–9–106 (1979).

Given these specific definitions, it is apparent the reserve account is neither an "account" nor a "contract right" of the debtor. The three percent in proceeds withheld by Ford Credit from the purchase price paid to the debtor for chattel paper does not represent proceeds of an "account" between the debtor and a retail customer. The debtor's right to receive payment from its retail customer was evidenced by chattel paper. Thus, no "account" existed between the debtor and its retail customer because a right to receive payment evidenced by chattel paper is expressly excluded from the definition of an "account." The funds in the dealer reserve account also do not represent proceeds of an "account" as between the debtor and Ford Credit. Since any right of the debtor in the funds is not the result of the debtor's sale or lease of any goods to Ford Credit or the rendering of any service to Ford Credit, any obligation of Ford Credit to the debtor involving the withheld proceeds is not an "account." The reserve account also does not represent a contract right.[6] The debtor had already performed and earned the right to payment from its retail customer. There was no contemplation on the part of the debtor and Ford Credit that some future performance pursuant to any contract between them would create an "account" triggering an obligation on Ford Credit's part to the debtor. Instead, the money in the reserve account was withheld by Ford Credit from dealer proceeds pursuant to a financing arrangement, pre-existing the Bank's interest, designed to secure any obligation of the debtor to Ford Motor Company or its subsidiaries. The withheld proceeds in the reserve account are quite simply money which belonged to the debtor.

Finally, the money in the reserve account should not be categorized as a general intangible. Examples of general intangibles cited in the official comment to Tenn.Code Ann. § 47–9–106 (1979) are copyrights, goodwill, literary rights, patents, rights to performance, and trademarks. Money is not mentioned in the comment. Furthermore, the definition of "general intangibles" is amended in the 1972 version of Uniform Commercial Code § 9–106: "General intangibles means any personal property (including things in action) other than ... money." The amendment of the definition was necessary, according to the UCC draftsmen, to preclude a determination that a security interest in money may be perfected by filing. Accordingly § 9–304 and § 9–305 of the 1972 version of the Uniform Commercial Code were also amended to make it quite clear that a security interest in money must be perfected by possession. The reason for the 1972 amendment of

---

**6.** The 1972 version of the Uniform Commercial Code § 9–106 has been amended to eliminate the term "contract right." An unearned right to payment for goods sold or leased or for services rendered not evidenced by an instrument or chattel paper is an "account" under the amended provision. The statement of "Reasons for 1972 Change" provides in part that the term contract right has proved trouble-some by creating a "proceeds" problem in cases in which contract rights become accounts by virtue of performance and in cases in which the secured party inadequately described its collateral in a financing statement by merely claiming "accounts" or "general intangibles" when the financing statement should have included a claim for "contract rights."

§ 9–304 is succinctly stated: "The change in subsection (1) corrects an inadvertent omission in the 1962 Text, and makes clear that a security interest in money cannot be perfected by filing."

This discussion of general intangibles and the method of perfection of a security interest in money highlights the reasons for the court's conclusion Ford Credit is entitled to the funds in the disputed account, even if it is assumed the debtor's wholesale financing obligations to Ford Credit are satisfied. The debtor's rights in the funds at issue were assigned to Ford Credit under the provisions of the September 21, 1971, assignment. The funds in the account are money. The security interest of Ford Credit in the money in the reserve account is perfected by virtue of its possession of the debtor's money. The Bank's interest in the funds is unperfected since it never had possession of the funds.

The court realizes the Tennessee legislature has not enacted the 1972 Uniform Commercial Code revisions cited herein. However, the 1962 version of the Code enacted in Tennessee does not contain a provision governing the perfection of a security interest in money. If confronted with the issue of the method necessary to perfect a security interest in money, the court believes the Tennessee Supreme Court would recognize the stated reasons for the 1972 changes in the Code and hold that possession is necessary to perfect a security interest in money.

The court's decision is distinguishable from a previous determination involving "factory holdbacks." *In re J & J Auto Sales, Inc.,* 9 U.C.C.Rep.Serv. 909 (Bkrtcy.E. D.Tenn.1971), involved a pre-bankruptcy agreement between Chrysler Motors Corporation and the bankrupt dealer in which Chrysler agreed to pay to the bankrupt two percent (2%) of the wholesale cost of each car sold at retail by the bankrupt. Commercial Credit Corporation provided the wholesale financing of the bankrupt's in-

ventory (automobiles). The wholesale security agreement between Commercial and the bankrupt granted a security interest in the bankrupt's merchandise and proceeds from the disposition thereof. Commercial's financing statement covered inventory and the proceeds thereof. When Commercial learned the bankrupt had sold inventory without accounting for the proceeds, it required the bankrupt to execute an assignment of the bankrupt's interest in all credits due or to become due from Chrysler, including factory holdbacks. No financing statement was filed based upon this assignment. The bankrupt's petition in bankruptcy was filed within seventy-five (75) days of the assignment to Commercial. This court determined the factory holdbacks were not proceeds derived from the sale of motor vehicles in which Commercial had a perfected security interest.[7] The security interest of Commercial was only perfected in the bankrupt's inventory and proceeds thereof. Proceeds represent a substitute for the original collateral; factory holdbacks were not included among the original collateral.

The distinction between the factory holdbacks in *J & J Auto Sales, Inc.* and the funds at issue is readily apparent. The former simply were not proceeds from the sale of inventory, whereas the funds at issue are dealer proceeds from the sale of inventory subject to Ford Credit's perfected security interest.

This Memorandum constitutes findings of fact and conclusions of law, Bankruptcy Rule 752.

---

**7.** Commercial did not assert the assignment was excepted from the filing requirements of

Article 9 by Tenn.Code Ann. § 47–9–302(1)(e).