JOHNSON, Circuit Judge:
 

 This bankruptcy adversary proceeding arises on direct appeal from the district court’s affirmance of the bankruptcy court’s finding that Ford Credit failed to properly perfect its security interest and
 
 *1509
 
 that it violated the bankruptcy setoff rules. 118 B.R. 898.
 

 I. STATEMENT OF THE CASE
 

 A.
 
 Background Facts
 

 In January of 1980, the debtor, Dillard Ford, entered into an inventory financing agreement with the appellant, Ford Credit. Ford Credit promised to loan Dillard Ford money to purchase new and used cars for its inventory. This inventory financing agreement included a security agreement which directly referenced a Ford Credit Manual that supplemented the agreement with additional standardized terms. This security agreement granted Ford Credit a security interest in various property interests owned by Dillard Ford.
 

 There were two related parts to this financing agreement. First, Ford Credit advanced Dillard Ford the funds needed to buy cars to fill its inventory. On a weekly basis, Dillard Ford was to give Ford Credit an itemized inventory list. When Dillard Ford sold a car it would pay off the inventory financing loan on that car. Under the evolving line of credit provisions of the agreement, Dillard Ford would simultaneously take out another loan to buy another car to restock its inventory. Second, Ford Credit participated in consumer retail financing. When a consumer sought to finance a car, Dillard Ford had authority to write a sight draft against Ford Credit and to deposit it into Dillard Ford’s sales account. These sight drafts drawn on Ford Credit’s account were payment from Ford Credit to the dealer in exchange for the chattel paper signed by the consumer. The consumer was obligated by this chattel paper to pay Ford Credit for the automobile loan. Thus, Ford Credit would send Dillard Ford two types of checks: one to finance its inventory and one to pay for the chattel paper sold to Ford Credit. In return, Dillard Ford was obligated to repay the inventory financing and send Ford Credit the chattel paper signed by the consumer.
 

 The financing agreement also created a dealer proceeds withheld (“DPW”) account held by Ford Credit. Under the agreement, Ford Credit agreed to pay the dealership for the chattel paper an amount equal to the present value of the chattel paper. Ford Credit would then place a portion of the money owed the dealer into a special fund, called the DPW account,
 
 [1]
 
 in order to cover the risk of consumers’ defaulting on the loans. Whenever the fund rose above three percent of the balance on the outstanding chattel paper, Ford Credit would pay the dealership the surplus. When all the chattel paper was paid in full, Ford Credit agreed to refund to the dealer any money left in the fund.
 

 On August 31, 1983, Ford Credit discovered that Dillard Ford had insufficient funds to cover two checks that were written to cover the dealer’s obligations under the inventory financing loan. The two checks totalled $17,374. One of Ford Credit’s managers promptly went to Dillard Ford and was told, by the president, that Dillard Ford either could not or would not cover the two checks. The Ford Credit manager informed the Dillard Ford president that he was suspending Dillard Ford’s inventory financing line of credit and its privilege of writing sight drafts against Ford Credit. The Ford Credit manager then conducted an audit of Dillard Ford’s inventory. During this audit he found that Dillard Ford had mailed a third check (for $10,650) and had recently sold two cars that were being financed by Ford Credit. The Ford Credit manager informed the bookkeeper that Ford Credit would take the chattel paper on the two car loans and apply the money Ford Credit owed on the chattel paper to offset the losses on the three bounced checks. The Ford Credit manager told the bookkeeper not to write sight drafts for these two pieces of chattel paper or for any future sales.
 

 The Ford Credit manager returned to his office and wrote two checks for the chattel paper and deposited the two checks in Ford
 
 *1510
 
 Credit’s account for inventory financing in order to set off a portion of the three bounced checks. A further examination of Ford Credit’s records, that same day, turned up two other pieces of chattel paper that had recently arrived in the Ford Credit office. Again the Ford Credit manager wrote two checks and deposited them in the inventory financing account.
 
 [2]
 

 B.
 
 Procedural History
 

 On September 9, 1983, Dillard Ford filed for chapter 7 liquidation. On November 18, 1983, the bankruptcy judge allowed Ford Credit to repossess all of Dillard Ford’s cars which had been inventory financed by Ford Credit. After sale of the cars, Dillard Ford still owed Ford Credit $54,943. Ford Credit, meanwhile, held $36,283 in Dillard Ford’s name in the DPW account and held the two disputed checks totalling $22,299.
 

 The trustee brought this adversary action to recover the money in the dealer proceeds fund and the two disputed checks. On December 15, 1989, following a trial, the bankruptcy court awarded the trustee a verdict on both of his claims. On August 16, 1990, the district court affirmed. This timely appeal was then brought.
 

 II. ANALYSIS
 

 A.
 
 The Dealer Proceeds Withheld Account
 

 One of the two disputes in this case involves the dealer proceeds withheld (DPW) account. The DPW account is held by Ford Credit to cover any losses that it incurs when it provides the financing for a consumer’s purchase of a car. The bankruptcy and district courts held that while Ford Credit had a security interest in the DPW account, it failed to properly perfect this security interest. The trustee argues that the lower courts erred because there was no security interest in the DPW account. Ford Credit argues that the lower courts erred because the security interests were properly perfected.
 

 1. Definitions
 

 Before it is possible to determine whether there was a security agreement or whether this agreement was properly perfected, we must first determine the proper definitions, under Article 9 of the Uniform Commercial Code, of each component part of this transaction. Clearly the dealer creates, and then sells to Ford Credit, chattel paper when the customer enters an agreement to finance a purchase of a car. According to the Uniform Commercial Code, chattel paper is “a writing ... which evidence^] both a monetary obligation and a security interest in [a] specific good[].” U.C.C. § 9-105(l)(b).
 
 [3]
 
 Neither party seriously disputes the fact that these consumer financing contracts are chattel paper.
 

 It is also obvious that any security interest in the DPW account constitutes a security interest in a general intangible. A general intangible is “any personal property ... other than goods, accounts, chattel paper, documents, instruments, and money.” U.C.C. § 9-106. Nonetheless, both parties erroneously assume that the DPW account is an account. An account is a “right to payment for goods sold ... or for services rendered which is not evidenced by an instrument or chattel paper,” U.C.C. § 9-106. The dealer’s contingent right to the money in the DPW account is a right to
 
 *1511
 
 payment for the sale of
 
 chattel paper,
 
 The sale of chattel paper is neither the sale of a good nor the rendering of a service.
 
 Compare
 
 U.C.C. § 9-105(l)(b) (defining chattel paper)
 
 with
 
 U.C.C. § 9-105(l)(h) (defining goods).
 
 [4]
 
 It also is clear that Ford Credit’s obligation to repay the dealers is neither a document,
 
 see
 
 U.C.C. § 9-105(l)(f), an instrument,
 
 see
 
 U.C.C. § 9-105(l)(i), nor money,
 
 see
 
 U.C.C. § 1-201(24).
 

 In order for Ford Credit’s security interest in the DPW account to be valid against the trustee in bankruptcy, the security interest
 
 [5]
 
 must comply with two basic requirements. First, the security interest must attach to the property in order to be enforceable. U.C.C. § 9-203. Second, the security interest must be perfected in order to prevail over a trustee in bankruptcy’s claim in a priority battle. U.C.C. § 9-301(l)(b) and § 9-301(3).
 

 2. The Security Agreement
 

 A security interest attaches when three conditions have been met. First, “the debtor[, Dillard Ford, must sign] a security agreement which contains a description of the collateral.” U.C.C. § 9-203(l)(a). Second, “value [must be] given.” U.C.C. § 9-203(l)(b). Third, the debtor [must have] rights in the collateral.” U.C.C. § 9-203(l)(c).
 

 The lower courts were correct in concluding that a security interest has attached to the DPW account. The financing agreement, which was signed by both parties, contains a description of the collateral in that it states that Ford Credit has a security interest in the DPW account. Value has been given in that Ford Credit gave the dealer money to finance its inventory. Finally, the debtor has rights in the collateral, albeit the rights are contingent.
 

 3. Perfection
 

 The lower courts held that this security interest is not enforceable against the trustee in bankruptcy because it was not properly perfected.
 
 See
 
 U.C.C. § 9-301(l)(b) and § 9-301(3). Ford Credit filed a UCC-1 financing statement which stated that Ford Credit had a security interest in Dillard Ford’s general intangibles and in other property rights owned by the dealer. The lower courts found that this financing statement was inadequate because it was too vague to place other hypothetical creditors on notice.
 

 The lower courts are mistaken in their reading of Article 9 of the Uniform Com
 
 *1512
 
 mercial Code. A financing statement is sufficient if it includes (1) the name and address of both the creditor and debtor; (2) “a statement indicating the
 
 types,
 
 or describes the items, of collateral;” and (3) the debtor’s signature. U.C.C. § 9-402(1) (emphasis added). There is no dispute that this financing statement complied with the first and third requirements of section 9-402. The only dispute is over the second requirement. The question presented in this appeal is whether this financing statement’s use of the term “general intangibles” complies with the description requirement found in section 9-402. We hold that it does. Section 9-402 allows a secured party to file a financing statement which describes the property only by its “type.” Although the term “type” is not defined in the Uniform Commercial Code, it is clear from the usage of the term in section 9-401(1) that a type of collateral is, for example, goods, accounts, chattel paper, general intangibles, etc. Moreover, the official comments state that the drafters of the UCC envisioned the filing system to be only a “notice filing” system which provides broad notice to other creditors. Later creditors who find the broadly worded financing statement are expected to inquire into the exact terms of the security agreement by reading the agreement or obtaining assurances from the debtor or creditor. U.C.C. § 9-402 official comment 2. Finally, the Georgia Supreme Court has stated, in dicta, that section 9-402 is to be read in a manner consistent with official comment 2.
 
 Personal Thrift Plan of Perry v. Georgia Power Co.,
 
 242 Ga. 388, 249 S.E.2d 72 (1978).
 

 B.
 
 The Setoff
 

 Ford Credit also appeals the lower court’s rulings on the pre-petition setoff. Before Dillard Ford filed for bankruptcy, Ford Credit’s manager setoff part of the dealership’s debt to Ford Credit by cashing two checks that Ford Credit owed to the dealership. The dealership owed the debt to Ford Credit under the inventory financing agreement. Ford Credit, in turn, was obligated to make payment on the two checks under the retail financing agreement. The lower courts held that this was an improper setoff under section 553 of the Bankruptcy Code.
 
 See
 
 11 U.S.C.A. § 553 (West 1979).
 

 A pre-petition setoff is valid as long as it complies with the state law governing a creditor’s right to setoff and with the requirements of section 553 of the Bankruptcy Code.
 
 See Republic Nat’l Bank of Houston v. Sheinfeld,
 
 488 F.2d 776 (5th Cir.1974); 11 U.S.C.A. § 553 (West 1979). The inventory financing agreement gave Ford Credit a right to setoff any of the dealership’s debts. The trustee does not argue that this pre-petition setoff was invalid under either the contract or state law.
 

 However, the trustee argues that the setoff was a voidable preference under section 547 of the Bankruptcy Code. The lower courts correctly rejected this argument. The Bankruptcy Code is explicit that questions of setoff are governed exclusively by section 553 of the Bankruptcy Code.
 
 See
 
 11 U.S.C.A. § 553 (West 1979) (“Except as ... provided in this section ... this Title does not affect any right of a creditor to offset a mutual debt”).
 

 Ford Credit’s actions were proper as long as they comply with the requirements of section 553 of the Bankruptcy Code. Section 553 lists three requirements: (1) the setoff must involve a mutual debt so that both the creditor and debtor owe each other money, 11 U.S.C. § 553(a); (2) both sets of obligations must arise prior to the bankruptcy filing,
 
 id.;
 
 and (3) the setoff cannot fall within three exceptions,
 
 id.
 
 There can be no dispute that this setoff meets both the first and second requirements of section 553. Before Dillard Ford filed for bankruptcy, the dealership owed Ford Credit money for providing inventory financing and Ford Credit owed the dealership money for the chattel paper that it bought. The two parties seriously dispute, however, whether Ford Credit can meet the third requirement.
 

 The trustee claims that this setoff is invalid because it fell within one of the three exceptions to setoff listed in section 553(a)(l)-(3). It is clear, however, that
 
 *1513
 
 Ford Credit’s claim does not fall within the first two exceptions: it would not be disallowed in bankruptcy,
 
 see
 
 section 553(a)(1), and Ford Credit did not obtain the claim from a third party,
 
 see
 
 section 553(a)(2). However, the trustee argues that Ford Credit incurred the debt “for the purpose of obtaining a right of setoff,” and that therefore this case falls within the third exception. Section 553(a)(3)(C). The trustee recounts how Ford Credit’s manager went to Dillard Ford and purposely picked up the sight drafts with the intention of using Ford Credit’s obligation to Dillard Ford to offset Ford Credit’s debt. The trustee has misread the statute. The section 553(a)(3) exception to setoff prevents the courts from rewarding creditors who persuade a debtor to engage in conduct which has the effect of impermissibly improving the creditor’s position among the other creditors. Although the conduct may occur in many forms, the archetypal situation is the case where a debtor has a preexisting obligation to the creditor, and, in the months prior to debtor’s filing for bankruptcy, the debtor pays back the creditor by “loaning” him money. Later the parties notice the two debts and engage in setoff, canceling both of them. In this archetypal situation, the creditor obtains the debt only to engage in setoff, thus this “loan” is disfavored by the setoff rules. In the case at hand, Ford Credit owed money to Dillard Ford because Dillard Ford sold the two cars and the purchasers chose to finance the cars through Ford Credit. Ford Credit did not incur the debt in order to obtain the setoff; its only action was to stop payment on the two sight drafts, thus obtaining the setoff. Therefore, Ford Credit’s action is not prohibited by the third exception, and this setoff is permitted by section 553.
 

 Section 553(b), however, allows a court to reduce the amount of setoff if it occurs within 90 days of the bankruptcy filing and if the creditor used this setoff to better its position. The lower courts found that the setoff allowed Ford Credit to better its position so they reduced Ford Credit’s setoff to zero. Under section 553(b), the court is required to calculate the “insufficiency” of the debt on two separate days and then compare these two calculations. The insufficiency equals the amount the debtor (Dillard Ford) owes the creditor (Ford Credit) less the amount the creditor owes the debtor. This calculation must be done for the day the setoff occurs and for Day 2.
 
 [6]
 
 Should the insufficiency on the date of the setoff be less than the insufficiency on Day 2, the creditor must refund the difference.
 

 The district court and Bankruptcy Court erred in applying this section of the Bankruptcy Code. The lower courts noted the setoff and concluded that Ford Credit must have improved its position. The lower courts, however, never compared the insufficiency on the day of the setoff to the insufficiency on Day 2. In fact, the lower courts never determined which day was Day 2. In a constantly changing commercial relationship with revolving lines of credit and changing levels of financed inventory, one can only guess what the insufficiency would have been on Day 2. In short, this portion of the case needs to be remanded for further factual findings before this Court can rule on the propriety of the setoff.
 

 III. CONCLUSION
 

 We REVERSE the lower courts' determination that Dillard Ford lacked a perfected security interest in the DPW account. We also REMAND the case to the bankruptcy court to make findings of fact on the insufficiency and to recalculate the setoff in a manner consistent with this opinion.
 

 [1]
 

 . The DPW account is merely an accounting device. The money is held in Ford Credit’s general funds and is not segregated.
 

 [2]
 

 . Of the four checks written by the manager for the chattel paper, two of them involved cars which were originally part of the inventory financed by Ford Credit. The trustee has not contested Ford Credit’s right to withhold payment on the chattel paper for these two cars. The trustee is contesting Ford Credit’s right to take the chattel paper without payment for the two cars for which Ford Credit did not provide financing.
 

 [3]
 

 . Both parties agree that this transaction is governed by Georgia’s version of the Uniform Commercial Code which is found at Ga.Code Ann. § 11-1-101
 
 et seq.
 
 Because Georgia’s version is to be read "liberally” in order to promote uniform law "among the various jurisdictions,” Ga. Code Ann. § ll-l-102(l)-(2) (1982), our citations will reflect the most current edition of the Uniform Commercial Code, rather than Georgia’s version. Of course, in the event of any variations in the two separate codes, we will follow Georgia’s version. Similarly, in our application of state law, we are bound by the Georgia courts’ interpretation of the code.
 

 [4]
 

 . The term "service" is not defined either in Article 9 or in section 1-201 of the Uniform Commercial Code. The only implication we can draw is that the drafters of the Code therefore desired private parties and the courts to interpret the phrase in light of common understanding.
 
 Cf.
 
 U.C.C. § 1 — 102(1)—(2) (stating the purposes of the code). The transaction in the case at hand does not involve a payment for a service rendered. To simplify matters considerably, in this transaction the dealers give Ford Credit chattel paper and in exchange Ford Credit pays the dealers in two separate installments: one payment occurs at the beginning of the transaction and the second payment occurs when the consumer pays off the chattel paper. Viewed in this light, the dealers have a right to the second payment only because of their sale of chattel paper to Ford Credit. This right does not arise from any service rendered. Of course, the analysis would differ if Ford Credit’s obligation to make the second payment arose in exchange for the dealer’s performance of some service such as the dealer taking steps to collect the customers’ debts.
 

 [5]
 

 . It is peculiar for Ford Credit to have a security interest in a debt that it owes to the dealer; however, such a security interest is valid under Article 9. As is clear from the definitions, this debt is a general intangible owned by the dealer. Section 9-102 of the Uniform Commercial Code states that Article 9 covers
 
 “any
 
 transaction (regardless of form) which is intended to create a security interest in personal property ... including general intangibles.” U.C.C. § 9-102(l)(a). Section 9-102 requires us to look at the substance, not the form, of a transaction. If in fact Ford Credit was split into two separate corporations, one engaging in inventory financing and the other specializing in consumer financing, the situation would be much less peculiar: the consumer financing corporation would owe the dealer the money in the DPW account; the dealer would owe the inventory financing corporation for its inventory financing; and the inventory financing corporation could have a security interest in the DPW account money owed to the dealer. Nothing in Article 9 prohibits Ford Credit from consolidating these two hypothetical corporations and then obtaining a security interest in a debt that it owes to the dealer.
 

 [6]
 

 . "Day 2" is a term we have devised to simplify matters. Day 2 is the later of 90 days prior to the bankruptcy petition or the first day within those 90 days that an insufficiency arises.