**In re THOMPSON BOAT CO., Debtor.**

**Randall L. Frank, Trustee, Plaintiff,**

v.

**ITT Commercial Finance Corp., Defendant.**

**Bankruptcy No. 93–20546.**
**Adversary No. 94–2072.**

United States Bankruptcy Court,
E.D. Michigan,
Northern Division.

July 11, 1995.

---

Susan M. Cook, Bay City, MI, for Plaintiff.

Charles M. Tatelbaum, Robert J. Diehl, Jr. and Marc M. Bakst, Detroit, MI, for Defendant.

## OPINION REGARDING MOTION TO DISMISS AND CROSS–MOTIONS FOR PARTIAL SUMMARY JUDGMENT

ARTHUR J. SPECTOR, Bankruptcy Judge.

### INTRODUCTION

On October 13, 1989, Thompson Boat Co. and ITT Commercial Finance Corp. entered into an agreement entitled "Floor Plan Repurchase Agreement." This agreement specified terms under which ITT would provide financing for dealerships that purchased boats from Thompson. One such term was Thompson's agreement to repurchase from ITT those boats which came into the latter's possession as a result of a dealership's failure to repay the loan from ITT.

On December 5, 1991, Thompson and ITT signed a "Recourse Addendum to Floor Plan Agreement." In this addendum, Thompson agreed to hold ITT harmless from any loss that ITT incurred in connection with the extension of financing to a dealership pursuant to the Floor Plan Repurchase Agreement. As security for the performance of this and Thompson's other obligations under the terms of the Floor Plan Repurchase Agreement and the Recourse Addendum, the latter document provides that ITT may deduct a certain percentage from amounts payable to Thompson for boats sold by Thompson and financed by ITT, and that the amounts so withheld by ITT "shall be deemed to be held and accounted for in a separate reserve account maintained in the books and records of ITT ('Reserve Account')." Recourse Addendum at ¶ B. The addendum states in part as follows:

> As security for all of [Thompson's] obligations to [ITT] under this Agreement, [Thompson] hereby pledge[s] and grant[s] to [ITT] a security interest in, all amounts held from time to time in the Reserve Account ... and agree[s] that upon any default ... of such obligations [ITT] may setoff and apply against those obligations any and all amounts so held in the Reserve Account....

*Id.* at ¶ F.

Michigan National Bank apparently held a perfected security interest in Thompson assets which predated execution of the foregoing addendum. On February 26, 1993, ITT entered into an agreement with MNB wherein the latter subordinated to ITT its rights in, among other things, "all reserves and reserve accounts, which are now or hereafter held by or on behalf of Thompson Boat or ITT." Subordination Agreement at ¶ 1. On March 5, 1993, ITT filed a financing statement relating to the reserve account. Thompson filed for relief under chapter 11 of the Bankruptcy Code, 11 U.S.C. § 101 *et seq.*, on May 19, 1993.

On August 5, 1994, the trustee filed his second amended complaint against ITT. Count I alleges that ITT's security interest in the reserve account and certain other assets of Thompson is subject to avoidance under 11 U.S.C. § 547(b). Count II seeks a determination that the trustee's rights in the

reserve account prime those of ITT under 11 U.S.C. § 544(a)(1) and (2).[1]

On August 16, 1994, ITT filed a motion to dismiss the second amended complaint. Both parties filed a motion for partial summary judgment on the question of whether ITT's interest in the reserve account is vulnerable to attack under § 547(b) and/or § 544(a). A hearing on the motions was held, at which the Court reserved decision on the issues raised. For the reasons which follow, ITT's motion for partial summary judgment will be granted, and the other motions will be denied.

## MOTION TO DISMISS

Section 547(b) allows the trustee to "avoid any transfer of an interest of the debtor in property" if the requirements enumerated therein are satisfied and no defense is applicable. For present purposes, one condition is that the transfer occur "on or within 90 days before the date of the filing of the [bankruptcy] petition." 11 U.S.C. § 547(b)(4)(A). Citing F.R.Civ.P. 12(b)(6) (made applicable here by F.R.Bankr.P. 7012(b)), ITT argued that Count I should be dismissed because this condition is not satisfied, and that Count II must also be dismissed because it is dependent upon avoidance of ITT's lien pursuant to Count I and § 547(b).

ITT is correct in suggesting that dismissal of Count I would doom Count II. Briefly stated, § 544(a) gives the trustee "the rights and powers of . . .—(1) a creditor [of the debtor] . . . that obtains . . . a [pre-petition] judicial lien on [the debtor's] property . . . [and] (2) a creditor [of the debtor] that . . . obtains . . . [a prepetition] execution against the debtor that is returned unsatisfied." If ITT's perfected security interest cannot be avoided pursuant to § 547(b), then the lien/execution creditor rights conferred on the trustee by virtue of § 544(a) would be useless. See, e.g., In re Bridge, 18 F.3d 195,

200 (3d Cir.1994) ("[A]lthough the trustee's strong arm powers arise under federal law [i.e., § 544(a)], the scope of these avoidance powers vis-a-vis third parties is governed entirely by the substantive law of the state in which the property is located . . . ."); Mich. Comp. Laws § 440.9301(1)(b) (providing generally that "an unperfected security interest is subordinate to the rights of . . . A person who becomes a lien creditor *before the security interest is perfected.*" (emphasis added)); *In re Murray,* 109 B.R. 245, 249 (Bankr. E.D.Mich.1989) (Under Michigan law, a trustee's interest in property acquired by virtue of § 544(a)(1) "is not superior to a perfected security interest.").

■ But ITT's attack on Count I falters because it completely disregards the trustee's theory. According to ITT, the date of the transfer which the trustee seeks to avoid under § 547(b) is December 5, 1991, the date the Recourse Addendum was executed. For purposes of § 547(b), however, a transfer is generally deemed to take place on the date it is perfected, if perfection occurs more than 10 days after the actual transfer date. § 547(e)(2)(B). The complaint alleges in paragraphs 24 and 25 that ITT's financing statement was filed within 90 days pre-petition and more than 10 days post-transfer.[2] Indeed, the complaint specifically cites § 547(e)(2)(B) for the conclusion that the transfer is subject to avoidance. *See* Second Amended Complaint at ¶ 24. The contention in ITT's brief that the complaint fails to identify a transfer occurring within the preference period is therefore without merit.

It appears that ITT eventually recognized the folly of this assertion, as it took an entirely different tack at the hearing. Rather than claiming the transfer occurred outside the preference period, ITT argued that dismissal was in order because one could determine from the exhibits attached to the

---

1. A third amended complaint adding four counts was filed on September 15, 1994. The additional counts are not relevant here.

2. Mich. Comp. Laws § 440.9302(1) sets forth the general rule that "[a] financing statement must be filed to perfect all security interests."

Although perfection of a security interest can also be effective upon possession by the creditor of the collateral, this was not an option here for reasons discussed shortly.

complaint that the reserve account was subject to ITT's right of recoupment.

The recoupment argument—which is relevant only to the reserve account—is also raised by ITT in connection with its motion for partial summary judgment, and will be discussed in detail in that context. *See infra* pp. 823–29. For purposes of the motion to dismiss, it suffices to note that recoupment cannot under any circumstances defeat the trustee's claim to the extent that the balance in the reserve account exceeds ITT's recoupment claims against Thompson. *See, e.g., In re Holford*, 896 F.2d 176, 179 (5th Cir.1990).

The complaint and attached exhibits do not demonstrate that ITT even has a claim against Thompson, much less that such claims are for an amount equal to or greater than that in the reserve account. *See generally, e.g., Bonilla v. Oakland Scavenger Co.*, 697 F.2d 1297, 1301 (9th Cir.1982), *cert. denied*, 467 U.S. 1251, 104 S.Ct. 3533, 82 L.Ed.2d 838 (1984) (A trial court should not consider "matters extraneous to the pleadings while treating the [Rule 12(b)(6) ] motion as one to dismiss, rather than as one for summary judgment."). Indeed, ITT conceded that neither party has yet quantified the other's alleged liability. *See* ITT's Motion for Partial Summary Judgment at p. 2 ("Should the Court grant ITT's Motion, the issue of the extent of the Reserve Account and the extent of ITT's dollar amount of claim to the Reserve Account will be brought before the Court by another motion.").[3] Since the complaint may state a cause of action regardless of whether ITT has a recoupment right, the motion to dismiss will be denied. *See, e.g., Mann v. Conlin*, 22 F.3d 100, 103 (6th Cir.), *cert. denied*, 513 U.S. 870, 115 S.Ct. 193, 130 L.Ed.2d 126 (1994) (" '[A] complaint should not be dismissed ... unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.' " (quoting *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957))).

*CROSS–MOTIONS FOR PARTIAL SUMMARY JUDGMENT*

As indicated above, both counts of the complaint hinge on the trustee's ability to avoid ITT's security interest pursuant to § 547(b). According to ITT, its security interest in the reserve account is not subject to such avoidance because it perfected that interest by possession, rather than by filing the financing statement as alleged by the trustee. The basis for this assertion is ITT's contention that the reserve account constitutes "money," as that term is defined by Michigan's version of the Uniform Commercial Code, Mich. Comp. Laws § 440.1101 *et seq.*

As a general proposition, it is true that *a security interest in money is perfected by possession. See* Mich. Comp. Laws § 440.9304(1). But ITT's contention that the reserve account is money does not withstand scrutiny.

The UCC defines "money" as "*a medium of exchange authorized or adopted by a domestic or foreign government,* ... includ[ing] a monetary unit of account established by an intergovernmental organization or by agreement between 2 or more nations." Mich. Comp. Laws § 440.1201(24). ITT obliquely suggested that this definition is not as straightforward as it seems by calling attention to the italicized portion of the following UCC comment:

> The test adopted [i.e., the standard for determining whether something qualifies as "money"] is that of sanction of government, whether by authorization before issue or adoption afterward, which recognizes the circulating medium as a part of the official currency of that government. *The* narrow *view that money is limited to legal tender is rejected.*

Official Uniform Commercial Code Comment § 1–201 (emphasis added).

Colloquially, the term "legal tender" is understood to mean currency—i.e., a lawful medium of exchange.[4] Thus the highlighted

---

3.  Of course, this concession serves to illustrate the incongruity of ITT's contention that the complaint must be dismissed based on its right to recoup.

4.  The UCC comment obviously was premised on the assumption that the term has a more restrictive definition, a proposition which could be debated. *See* 31 U.S.C. § 5103 ("United States coins and currency ... are legal tender for all

text from the UCC comment, read in isolation, would indicate that "money" can include things other than currency. Read in its entirety, however, it is obvious that the comment in no way detracts from or modifies the statutory definition of money as a government-approved medium of exchange.

Another straw grasped by ITT is an income tax case, *Commissioner v. Hansen,* 360 U.S. 446, 79 S.Ct. 1270, 3 L.Ed.2d 1360 (1959). There the Court held that "amounts ... that were withheld [from the taxpayers, the sellers of installment paper] by the [purchasers of the paper] constituted accrued income ... at the time the withheld amounts were entered on the books of the [purchasers] as liabilities to the [taxpayers], for at that time the [taxpayers] acquired a fixed right to receive the amounts so retained." *Id.* at 466, 79 S.Ct. 1270. In so holding, the Court reasoned that any portion of the withheld funds used to satisfy obligations owed by the taxpayer to the purchaser of the paper would be "as much 'received' by [the taxpayer] as those [funds] which the [purchaser of the paper] pays to him in cash." *Id.*

The principle to be derived from *Hansen* is that, for purposes of defining taxable income, there is no distinction to be drawn between a third party's payment of cash directly to the taxpayer and the third party's use of that cash to pay a debt owed by the taxpayer. That's all well and good, but it is hopelessly irrelevant to the question of whether the reserve account at issue here fits within the UCC definition of "money."

Once ITT's smoke screen dissipates, it can clearly be seen that, for present purposes, money means dollar bills and coinage.[5] *See* 1 Ronald A. Anderson, *Uniform Commercial Code,* § 1–201: 362 (3d ed. 1994) ("It is essential ... that the money be given credence or honor by authority of a government, and the mere fact that it is so treated as a

matter of custom or usage is not sufficient."); *Christison v. United States,* 960 F.2d 613, 616 (7th Cir.1992) ("Under the U.C.C., 'money' ... is limited to currency."); *see generally* 2 James J. White and Robert S. Summers, *Uniform Commercial Code* § 24–12 (3d ed. 1992) (Collateral which can be perfected by possession "must be the type that one can see, touch and move .... [It] must have a physical embodiment recognizable as exclusively representing the right.").

There are provisions in the Recourse Addendum which suggest that ITT's collateral is money because they focus on the funds deposited, rather than the account *per se.* For example, ¶ F states that Thompson "pledge[s] and grant[s] to [ITT] a security interest in, all amounts held ... in the Reserve Account." Page one of the addendum provides that "if [Thompson] fail[s] to immediately pay [ITT] the full amount of ... [ITT's] loss [resulting from the failure of a dealership to repay sums borrowed from ITT] when [ITT] notif[ies Thompson] thereof, [ITT] may apply any or all amounts in the Reserve Account ... until each such loss is paid in full." Those "amounts ... held in the Reserve Account" which ITT does not use to reimburse itself for losses incurred are to be "returned ... to [Thompson] ... upon the effective date of any termination of [the] Agreement." Recourse Addendum at ¶ G.

These provisions notwithstanding, there are numerous considerations which lead to the conclusion that ITT does not hold a security interest in money. Paragraph B of the Recourse Addendum states that "nothing herein shall be construed to require that ITT actually open and maintain an independent account with a third-party financial institution in respect [to the reserve account]." Although this proviso leaves open the possibility that ITT would "actually open" an internal account comprised exclusively of funds withheld from Thompson, there is nothing in

---

debts...."); *Black's Law Dictionary* (5th ed. 1979) ("Currency" means "[c]oined money and such ... paper money as are authorized by law and do in fact circulate from hand to hand as the medium of exchange.").

**5.** There are other forms of money, such as federal reserve notes. *See Commonwealth v. Saville,*

353 Mass. 458, 463, 233 N.E.2d 9 (1968); *cf.* 31 U.S.C. § 5103 ("... Federal reserve notes and circulating notes of Federal reserve banks and national banks ... are legal tender for all debts ...."). This opinion, however, will focus on more mundane examples of currency.

the parties' agreement requiring that it do so.

To the contrary, the Recourse Addendum consistently makes reference to the fact that the amounts withheld from Thompson are "deemed" to be held in a reserve account. *See, e.g.,* Recourse Addendum at ¶¶ B and C. This strongly suggests that the account and the money comprising it are fictitious.

ITT's conduct since execution of the Recourse Addendum is also instructive. As explained by ITT's counsel, "[t]he Reserve Account was and is a bookkeeping entry on the books of ITT with respect to the indebtedness of [Thompson] to ITT. The 'funds' of the Reserve Account have been commingled with and maintained with the general operating funds of ITT." ITT's Brief at p. 5. *See also* ITT's Response to Trustee's Brief at p. 3 (indicating that the reserve account was "not physically separated from [ITT's] regular accounts . . . but [was] simply tracked on [ITT's] ledger books"). Moreover, the subordination agreement with MNB and the financing statement which ITT filed (and which Thompson signed) make reference to the reserve account, precautions which would be unnecessary if, as ITT now asserts, mere possession of the reserve account constituted perfection of its security interest. The fact that no reserve account actually exists and that ITT took actions above and beyond "possession" to protect its security interest suggest that the parties to the Recourse Addendum did not intend to create a security interest in money. *Cf. Jones Mfg. v. Wortech, Inc.,* 91 B.R. 60, 61 (E.D.Mo.1988) ("[A]ppellant filed 34 UCC financing statements in favor of appellee[,] evidencing the parties' intent that appellee be considered a secured party . . . ."); *see generally, e.g., Loizeaux Builders Supply Co. v. Donald B. Ludwig Co.,* 144 N.J.Super. 556, 366 A.2d 721, 724 (1976) ("The subsequent conduct of

the parties [to a contract] is . . . relevant in revealing their original understanding."); 17 Am.Jur.2d *Contracts* § 274, pp. 683–84 (1964) ("[T]he practical construction or uniform conduct or practice of the parties under a contract is a consideration of much importance in ascertaining its meaning and . . . is entitled to great, if not controlling, influence in ascertaining the parties' understanding of the contract terms . . . .") (*quoted in In re Perry, Adams and Lewis Securities,* 30 B.R. 845, 850–51 n. 15 (Bankr.W.D.Mo.1983)).

For the sake of clarity, I stress that I am not challenging the wisdom of the view that a creditor who takes possession of money as collateral can transform it into something else without losing its status as a perfected security-interest holder. *See In re Vienna Park Properties,* 976 F.2d 106, 116 (2d Cir. 1992) ("There is no question that the funds held in the escrow account, United States dollars, are 'money' within [the UCC's] definition."); *In re O.P.M. Leasing Servs.,* 46 B.R. 661, 670 n. 5 and accompanying text (Bankr.S.D.N.Y.1985) (where the court held that money paid by a partnership into an escrow account to secure its performance of a reimbursement obligation gave rise to a perfected security interest in the money paid, reasoning that "[i]t would be absurd . . . to hold that [such an interest] is valid only when the money is held in a desk drawer or lockbox"). The point here is that the reserve account *never was* cold cash; from its inception, it was simply a bookkeeping abstraction which by no stretch of the imagination could be characterized as an officially recognized exchange medium. I therefore conclude that it is not money.[6] *See In re Dillard Ford, Inc.,* 940 F.2d 1507, 1511 (11th Cir.1991) ("It . . . is clear that Ford Credit's obligation to repay the dealers [funds that were withheld in connection with the purchase of chattel paper from the dealers] is . . . [not] money

---

6. The fact that no money was actually paid into a reserve account distinguishes this case from *In re Morristown Lincoln-Mercury,* 27 B.R. 801 (Bankr.E.D.Tenn.1983), an opinion cited by ITT in which the court ruled under similar circumstances that the creditor held a security interest in money. *See id.* at 807–08. There the creditor "deposited the withheld funds in a separate and distinct 'Dealer Proceeds Withheld Account.'" *Id.* at 802.

*Morristown* is problematic in any event, as the court did not adequately explain its conclusion that the withheld money "belonged to the debtor." *Id.* at 807. *See generally* Mich. Comp. Laws § 440.9203(1) (UCC § 9–203(1), 1972 version) ("[A] security interest is not enforceable . . . and does not attach unless . . . (c) The debtor has rights in the collateral.").

[under] U.C.C. § 1–201(24)."); *see also Vienna Park Properties,* 976 F.2d at 116 ("A contractual right to obtain money at some future time is not the same thing as money itself."); *Christison,* 960 F.2d at 616 ("Under the U.C.C., 'money' does not mean the right to receive money . . . .").

■ The trustee contends that the reserve account is an "account" or a "general intangible." For purposes relevant here, the former term is defined by the UCC as "any right to payment for goods sold or leased or for services rendered," whereas the latter encompasses "any personal property . . . other than . . . accounts . . . and money." Mich. Comp. Laws § 440.9106. I agree with the trustee that the collateral fits under one of these rubrics. *See Dillard Ford,* 940 F.2d at 1510 ("[A]ny security interest in the [dealer proceeds withheld] account constitutes a security interest in a general intangible.").[7]

■ Accordingly, ITT could only perfect its security interest by filing a financing statement. *See* Mich. Comp. Laws § 440.9302(1); Official Uniform Commercial Code Comment § 9–304 ("For some types of intangibles (i.e., accounts and general intangibles) filing is the only available method" for perfecting a security interest.); Official Uniform Commercial Code Comment § 9–305 ("This section permits a security interest to be perfected by transfer of possession only when the collateral is goods, instruments . . ., documents or chattel paper: . . . accounts and general intangibles are excluded."). Since it did so within the preference period established by § 547(b)(4)(A), and assuming for the purpose of this discussion that all other elements of § 547(b) are satisfied, its security interest is subject to avoidance. As a result of such avoidance, the trustee acquires the rights, formerly enjoyed by ITT, of a holder of a perfected security interest in the reserve account. *See* 11 U.S.C. § 551; *see also, e.g., In re Coal–X Ltd.,* 60 B.R. 907, 911, 14 C.B.C.2d 1325 (Bankr.D.Utah 1986) (". . . Section 551 is normally utilized when the trustee avoids a creditor's lien on property . . . . The trustee then steps into the

shoes of such creditor; in effect, the trustee is subrogated to the rights of the lien creditor with the avoided lien.").

ITT made a poorly articulated argument suggesting that, even if the financing statement which it filed constitutes an avoidable transfer, it nevertheless holds a perfected security interest in the reserve account which it acquired by virtue of its subordination agreement with MNB. But the subordination agreement does not support that contention.

■ When the subordination agreement was executed, ITT and, according to the parties, MNB each held a security interest in the reserve account. The preamble indicates that the agreement addresses "the relative priority of . . . the[se] respective interests." Subordination Agreement at p. 1. Consistent with that purpose, the agreement provides that MNB "hereby subordinates to ITT" its rights in the reserve account. *Id.* at ¶ 1. *See Black's Law Dictionary* (5th ed. 1979) ("Subordination [means t]he act . . . by which a person's rights are ranked below the rights of others."). *See also* Subordination Agreement at ¶ 2 ("The *priorities* specified herein are applicable irrespective of time or order of attachment or perfection of security interest . . . . The *respective priorities* of ITT . . . and [MNB] in the assets . . . which are not covered by this Agreement shall be determined in accordance with the [UCC] . . . ." (emphasis added)).

It is clear from the foregoing provisions that the subordination agreement was not an assignment to ITT of MNB's security interest. As the document's title would imply, MNB simply agreed not to challenge the primacy of ITT's security interest in the reserve account. The agreement did not purport to vest in ITT any kind of security interest, nor did it purport to perfect or otherwise validate (except as against MNB) ITT's pre-existing security interest. I therefore reject the contention that the agreement somehow insulates ITT's interest from attack under § 547(b).[8]

---

7. Which of the two designations is appropriate has no impact on the disposition of this case.

8. If MNB does in fact hold a perfected security interest in the reserve account, one might ask what the trustee hopes to gain by attacking ITT's

The conclusion that the trustee succeeds to ITT's status as the holder of a perfected security interest in the reserve account does not end the matter. The UCC provides that an " '[a]ccount debtor' means the person who is obligated on an account ... or general intangible." Mich. Comp. Laws § 440.9105(1)(a). Under the terms of the agreement between Thompson and ITT, that "person" is ITT. Thus ITT is wearing two hats here—that of secured creditor and that of account debtor. *Cf. Dillard Ford,* 940 F.2d at 1511 n. 5 (The fact that a single entity held a security interest in a debt that it owed to a dealer is not inappropriate, inasmuch as the entity was in substance functioning in two separate capacities.). So while the trustee can use § 547(b) to remove the first of these hats, the second hat remains firmly atop ITT's corporate pate. And it is in its account-debtor persona that ITT mounts its principal argument—namely, that the trustee's rights to the reserve account under §§ 547(b) and 551 are subordinate to ITT's contractual right to deduct from the balance in the reserve account amounts owing to it before paying any remaining account funds over to Thompson. *See, e.g.,* Recourse Addendum at ¶ F ("[U]pon any default by [Thompson] of [its] obligations, [ITT] may setoff and apply against those obligations any and all amounts ... held in the Reserve Account ...."); *id.* at ¶ G. ("All amounts ... held in the Reserve Account ... not offset or applied by [ITT] ... shall be returned ... to [Thompson] upon the effective date of any termination of this Agreement.").

The trustee did not quarrel with the proposition that ITT has such a right under the terms of the agreement between ITT and Thompson. Instead, he argued that the right is one of setoff and, as such, is subject to the trustee's security interest. ITT, on the other hand, argued that it has a right of recoupment rather than setoff.

█ Both "setoff" and "recoupment" involve the use of a counterclaim—i.e., the assertion by a party of a claim that it holds as a means of reducing the amount of a claim asserted against it. *See Black's Law Dictionary* (5th ed.1979). Generally speaking, the party asserting the counterclaim is said to be invoking a right of "recoupment" if the claims arise from the same contract or transaction. *See id.* Depending on how the term is defined, such a nexus either need not or must not exist in order for the counterclaim to qualify as a "setoff." *Compare id.* (Setoff is "[a] counter-claim ... arising out of a transaction extrinsic of plaintiff's cause of action.") *with* Note, *Conflicts Between Set-Offs and Article 9 Security Interests,* 39 Stan. L.Rev. 235, 235 n.2 (Nov.1986) ("Some set-off rights can also be called 'recoupment' rights when both debts arise out of the same transaction.").[9] To avoid confusion, I will use "setoff" in its narrowest sense, meaning non-recoupment counterclaims.

The setoff/recoupment distinction seems somewhat formalistic, but it can have practical consequences. It has been stated, for example, that unlike setoff, "recoupment is not subject to the automatic stay of section 362(a)." *Holford,* 896 F.2d at 179.

A more relevant example of the law's deference toward parties asserting a recoupment is UCC § 9–318(1).[10] With an excep-

---

security interest. *See, e.g., In re Antinarelli Enters.,* 94 B.R. 227, 228 (Bankr.D.Mass.1988), *vacated on other grounds,* 107 B.R. 410 (D.Mass. 1989) (collecting cases for the proposition that "the trustee avoiding one security interest does not impair the rights of superior duly perfected security interest[s in] the collateral"). In this regard, the trustee apparently takes the position that, upon avoidance of ITT's security interest, it acquires the latter's rights under the subordination agreement. Since MNB is not a party to this proceeding, I will not address the merit of that assertion, which in any event may prove to be moot given the disposition of the motions before me.

9. Because recoupment can be viewed as a subspecies of setoff, the Recourse Addendum's use of the term "setoff" is not particularly noteworthy. In any event, a determination as to whether ITT holds a recoupment right against Thompson should logically focus on the relation between the parties' respective claims, not on the label used by the parties to describe that right.

10. The disparity in treatment may stem from the belief that the right to recoup has a more deeply rooted equitable underpinning than does the right of setoff. *See generally, e.g. City of Grand Rapids v. McCurdy,* 136 F.2d 615, 619 (6th Cir. 1943) ("Recoupment goes to the justice of the plaintiff's claim, while set-off is not necessarily confined to the justice of such ... claim.").

tion not applicable here, Michigan's version of that provision specifies that "the rights of an assignee [of an account] are subject to: (a) All the terms of the contract between the account debtor and assignor and any defense or claim arising therefrom; and (b) Any other defense or claim of the account debtor against the assignor which accrues before the account debtor receives notification of the assignment." Mich. Comp. Laws § 440.9318(1). *See In re Ehrhart,* 155 B.R. 458, 462 (Bankr.E.D.Mich.1993) (Michigan law determined whether the bankruptcy trustee's claim was subject to recoupment.).

■ Although the statute does not use the terms, subparagraphs (a) and (b) of UCC § 9–318(1) roughly correspond to the common law principles of "recoupment" and "setoff," respectively.[11] *See, e.g., In re Metropolitan Hospital,* 131 B.R. 283, 290 (E.D.Pa. 1991) ("Under [UCC] § 9–318[ (1)(b) ] a right of setoff may be asserted if it arises before notification of the account assignment."); *In re Metropolitan Hospital,* 110 B.R. 731, 741, 22 C.B.C.2d 661 (Bankr.E.D.Pa.1990), *aff'd,* 131 B.R. 283 (E.D.Pa.1991) ("[UCC § ] 9–318[ (1)(a) ] would permit the Secretary to prevail if one characterizes the offset as that of recoupment or as related to the contract regarding medicare provider services."). And it is on the basis of § 9–318(1)(b) that the trustee asserts the primacy of his security interest.

In this respect, then, the "recoupment/setoff" taxonomy is potentially significant here.[12] However, before launching into an inquiry concerning whether ITT's claims satisfy the "same-contract" test imposed by § 9–318(1)(a), I first consider whether § 9–318(1) applies to the present dispute.

The priority of article 9 security interests is generally governed by Mich. Comp. Laws § 440.9312 which, with certain exceptions, "rank[s such interests] according to . . . [the] time of filing or perfection." Mich. Comp. Laws § 440.9312(6)(a). But UCC § 9–312 is in essence a default provision, as it provides that "[t]he rules of priority stated in other sections of . . . part [3] . . . shall govern when applicable." Mich. Comp. Laws § 440.9312(1). And since § 440.9318(1) specifically delineates the extent to which the assignee of an account is vulnerable to setoff and recoupment claims asserted by the account debtor, it rather than § 440.9312 would certainly appear to be controlling here.

In this regard, some have noted that UCC § 9–318(1) does not explicitly mention security interest holders, thus calling into question whether such interests are within the statute's scope. *See In re Otha C. Jean Assocs.,* 152 B.R. 219, 222 (Bankr.E.D.Tenn.1993); S. Sepinuck *The Problems With Setoff: A Proposed Legislative Solution,* 30 Wm. & Mary L.Rev. 51, 80 n.120 (Fall, 1988). It also bears noting that subparagraph (4) of this section refers to both "assignments" and "security interests," thus arguably implying that the latter term is not subsumed by the former for purposes of § 440.9318(1).

In spite of these considerations, many authorities have assumed or explicitly concluded that secured creditors are within the reach of UCC § 9–318(1). *See, e.g., id.;* T. Quinn, 2 *Quinn's Uniform Commercial Code Commentary & Law Digest,* ¶ 9–318[A][1] (2d ed.1991); *In re Apex Oil Co.,* 975 F.2d 1365, 1370 (8th Cir.1992); *Bank of Waunakee v. Rochester Cheese Sales,* 906 F.2d 1185, 12 U.C.C. Rep. Serv.2d 284, 290–92 (7th Cir. 1990); *Otha C. Jean Assocs.,* 152 B.R. at 223;

---

**11.** According to the trustee, Michigan common law requires "that a claim of recoupment . . . arise out of the same contract" as that under which the party asserting the claim is liable. Trustee's Brief at p. 19 (citing *Flynn v. Barry,* 221 Mich. 422, 191 N.W. 215 (1922)). But *Flynn* in fact requires only that the claims arise out of the same contract *or transaction. See Flynn,* 221 Mich. at 423–24, 191 N.W. 215. This is an important qualification because the term "transaction" is "broader . . . than 'contract,'" encompassing "several acts or agreements having some connection with each other." *Black's Law Dic-*

tionary (5th ed.1979). Thus to invoke the common law doctrine of recoupment, "[i]t is sufficient that the counter-claims arise out of the same subject-matter, and that they are susceptible of adjustment in one action." *Ward v. Township of Alpine,* 204 Mich. 619, 630, 171 N.W. 446 (1919) (citations omitted).

**12.** ITT asserted that it must prevail even if it has only a setoff right. Because I hold that its right is one of recoupment, I will not address that issue.

*West One Bank, Utah v. Life Ins. Co. of Va.,* 887 P.2d 880, 884 (Utah App.1994); *Bank of Kansas v. Hutchinson Health Servs.,* 13 Kan. App.2d 421, 773 P.2d 660, 9 U.C.C. Rep. Serv.2d 307, 312–13 (1989), *aff'd* 246 Kan. 83, 785 P.2d 1349 (1990). *Chase Manhattan Bank v. State,* 48 A.D.2d 11, 367 N.Y.S.2d 580 (1975), *aff'd* 40 N.Y.2d 590, 388 N.Y.S.2d 896, 357 N.E.2d 366 (1976). I believe they are correct in doing so.

■ The central purpose of Article 9 of the UCC, of course, is to regulate secured transactions. *See* Mich. Comp. Laws §§ 440.9101 and 440.9102. The UCC states that the "article applies to security interests created by ... assignment." Mich. Comp. Laws § 440.9102(2). Article 9 also refers to the party granting a security interest in accounts as an "assignor," *see* Mich. Comp. Laws § 440.9502(1), which by logical extension would cast the secured party in the role of "assignee." In light of these provisions, it is certainly reasonable to infer that § 440.9318(1)'s reference to the "rights of an assignee" encompasses such rights when acquired through a security agreement. And there is no provision in the UCC which clearly contradicts this inference.

■ Further support for this interpretation of § 440.9318(1) is provided by Michigan law. *See,* 9 Anderson *Uniform Commercial Code,* § 9–318:12 (3d ed. 1994) ("The pre-[UCC] law of the state determines whether there has been an assignment as the [UCC] does not define what constitutes an assignment."). In *Allardyce v. Dart,* 291 Mich. 642, 644–45, 289 N.W. 281 (1939), the Michigan Supreme Court defined an assignment as "[a] transfer ... of property, or of some right or interest therein, from one person to another." Because it recognizes conveyances of interests which are not outright, absolute or complete, this definition is sufficiently flexible to include the granting of a security interest. For these reasons, I conclude that a party who obtains rights in an account by an assignment is an "assignee" for purposes of § 440.9318(1) although such rights were obtained as security for the assignor's performance of certain obligations.

While apparently accepting the foregoing proposition, a couple of cases intimate that

UCC § 9–318(1) does not apply to a secured party unless certain unspecified account-collection efforts are or can be made. *See General Electric Capitol Corp. v. Deere Credit Servs.,* 799 F.Supp. 832 (S.D.Ohio 1992) ("[T]he mere existence of a security interest in chattel paper does not, in and of itself, create an 'assignment' under UCC § 9–318 ...."); *In re Gibson Group,* 126 B.R. 759, 762, 21 B.C.D. 1083 (Bankr.S.D.Ohio 1991) (declining to apply UCC § 9–318 because the secured creditor "simply is not at this time an assignee of debtor's accounts receivable[; i]t has taken no action to vindicate its rights as to its collateral"). But the statute itself does not support this assertion.

UCC § 9–318(1) delimits the "rights of an assignee" vis-à-vis the account debtor. Although the extent of those rights may turn on whether and when the account debtor received "notification of the assignment," *see* Mich. Comp. Laws § 440.9318(1)(b), the statute's applicability does not: nothing in the text of § 9–318 suggests that its scope is limited to certain kinds of rights in the account, such as those which are presently enforceable or noncontingent. I therefore reject the view that a secured creditor whose assignee rights are in some respect unexercised or unmatured can thereby escape the dictates of UCC § 9–318.

The conclusion that UCC § 9–318 is controlling here would seem to be inconsistent with *Southeastern Financial Corp. v. National Bank of Detroit,* 145 Mich.App. 717, 377 N.W.2d 900 (1985). In *Southeastern,* the plaintiff held a perfected security interest in unspecified collateral, proceeds from which were deposited by the debtor in a bank account. The defendant bank claimed it could use the deposited funds to set off a debt owed to it by the debtor/depositor, who was not a party to the action. The court ruled for the plaintiff based on Mich. Comp. Laws § 440.9201, which states that, "[e]xcept as otherwise provided by this act [i.e., the UCC,] a security agreement is effective ... against creditors." *Id.* at 721, 377 N.W.2d 900.

This statute applied, the court reasoned, because "there [was] no specific priority pro-

vision that addresse[d] th[e] conflict." *Id.* at 720, 377 N.W.2d 900. Thus while the court did not specifically mention Mich. Comp. Laws § 440.9318, it suggested by way of negative inference that that section does not govern disputes between the holder of a security interest in an account and the account debtor asserting a right of setoff or recoupment.

It bears emphasizing, however, that in *Southeastern* the debtor's bank account constituted cash proceeds of the plaintiff's collateral. *See id.* at 719, 377 N.W.2d 900 (describing "the funds" deposited in the account as "proceeds"); *id.* at 719 n. 1, 377 N.W.2d 900 (quoting Mich. Comp. Laws § 440.9306(1), which states in part that proceeds in the form of "deposit accounts[ ] and the like are 'cash proceeds' " ).[13] It was presumably for this reason that the court disregarded Mich. Comp. Laws § 440.9318(1). *Cf. United States v. Handy & Harman,* 750 F.2d 777, 39 UCC Rep. Serv. 1553, 1566 (9th Cir.1984) ("Cash proceeds are not 'accounts' within the meaning of the [UCC] . . ., and [UCC] § 9318(1) is thus not applicable.").

In contrast to *Southeastern,* ITT's security interest (and, therefore, the trustee's security interest) originated in the reserve account, not in some pre-existing property interest of Thompson's. Since the reserve account is not "proceeds" from the disposition of other ITT collateral, *Southeastern* is inapposite insofar as it purports to speak to Mich. Comp. Laws § 440.9318's applicability to conflicts between security interests and setoff rights.

One other consideration relevant to this issue is Mich. Comp. Laws § 440.9104(i), which provides that "article [9] does not apply . . . [t]o any right of setoff." This statute merits attention here because recoupment is sometimes described as a form of setoff, and because there is no obvious reason why the drafters of article 9 would exclude setoff but not recoupment.

In the words of one author, cases are divided on the question of whether UCC § 9-104(i) "only removes setoff from Article 9's attachment and filing provisions, . . . [or whether it also renders] Article 9's priority rules" inapplicable. S. Keene, *Article 9's Setoff Exclusion: The Conflict Between a Bank's Right of Setoff and a Holder of a Perfected Security Interest,* 27 UCC L.J. 115, 116 (Fall, 1994). *See id.* at 130 n. 105 and 133 n. 121 (collecting cases). To the extent proponents of the latter proposition interpret UCC § 9-104(i) as meaning that article 9 has nothing at all to say with respect to the priority of setoff rights, however, I believe their position is untenable.

Pursuant to Mich. Comp. Laws § 440.9306(4)(d)(i), a perfected security interest in certain proceeds that have been "commingled with other funds" is "[s]ubject to any right of setoff." The effect of this (article 9) statute is to subordinate the rights of a security interest holder to those of a party asserting a setoff claim under the circumstances described therein. Thus to reconcile § 440.9306(4)(d)(i) with § 440.9104(i), one must infer that the latter statute puts forth the general rule that, *except as otherwise provided,* article 9 does not speak to the validity/priority of setoff rights.

In contrast to § 440.9306(4)(d)(i), § 440.9318(1) does not explicitly refer to the right of "setoff," as such. But it clearly concerns that right. *See supra* pp. 823–24. The better view, then, is that § 440.9318(1), like § 440.9306(4)(d)(i), represents an exception to the rule announced in § 440.9104(i).

**13.** Although the court did not specifically state that the bank account in question was a "deposit account," I assume that it was. *See* Mich. Comp. Laws § 440.9105(1)(e). (" 'Deposit account' means a demand, time, savings, passbook, or like account maintained with a bank . . . or like organization, other than an account evidenced by a certificate of deposit."); *Design Spectrum v. First Nat'l Bank of Atlanta,* 182 Ga.App. 418, 355 S.E.2d 733, 3 UCC Rep. Serv.2d 1907, 1908 (1987) (A checking account is a deposit account for purposes of UCC § 9-105(1)(e).); *Southeast-*

*ern,* 145 Mich.App. at 718, 377 N.W.2d 900 (The "funds were . . . deposited in [the depositor's] account at defendant Bank."). As such, article 9 of the UCC would apply only if the account represented proceeds from the disposition of collateral. *See* Mich. Comp. Laws § 440.9104(1); *see also, e.g.,* J. Schroeder, *Is Article 8 Finally Ready This Time? The Radical Reform of Secured Lending on Wall Street,* 1994 Colum. Bus. L.Rev. 291, 420 ("Article 9 expressly does not govern security interests in deposit accounts, except insofar as they constitute proceeds.").

*Cf. Southeastern,* 145 Mich.App. at 719–21, 377 N.W.2d 900 (acknowledging Mich. Comp. Laws § 440.9104(i), but holding that the defendant's setoff right was subordinated by Mich. Comp. Laws § 440.9201 to the plaintiff's security interest).[14]

■ There being no compelling reason to rule otherwise, I conclude that, in his capacity as a perfected security interest holder in the reserve account, the trustee is an assignee for purposes of Mich. Comp. Laws § 440.9318(1). Thus even if recoupment is a form of setoff for UCC purposes, and even if *Southeastern* was correct in holding that a party asserting a setoff right is subject to Mich. Comp. Laws § 440.9201's priority rule, that statute—which by its own terms is controlling only when there is no contrary provision in the UCC—is inapplicable. *See, e.g., Bank of Kansas v. Hutchinson Health Servs.,* 13 Kan.App.2d 421, 773 P.2d 660, 9 UCC Rep. Serv.2d 307, 313 (1989), *aff'd,* 246 Kan. 83, 785 P.2d 1349 (1990) (describing UCC § 9–201 as "[t]he general priority rule," but further stating that, "when the setoff is asserted by the account debtor, the priority rule is 'otherwise provided' by" UCC § 9–318). *But see In re Tecumseh Constr. Co.,* 157 B.R. 471, 472, 21 U.C.C. Rep. Serv.2d 1175 (Bankr.E.D.Cal.1993) (concluding, with little analysis and no discussion of UCC § 9–318(1)(a), and in my opinion erroneously, that "recoupment cannot defeat the rights of a creditor who holds a properly perfected Article 9 security interest"). I therefore hold that, pursuant to § 440.9318(1)(a), the trustee's security interest in the reserve account is subject to whatever contractual claims ITT may have against Thompson.

The next question, then, is whether ITT does in fact have a right of recoupment—i.e., whether the counterclaims that it could raise against Thompson satisfy § 9–318(1)(a)'s same-contract requirement.

Both sides agree that ITT's right of payment stemmed from the Floorplan Repurchase Agreement and its addendum, and the trustee does not dispute that these two documents constitute a single contract (henceforth, the "ITT/Thompson contract"). But the trustee does dispute ITT's contention that Thompson's right of payment arose from that contract. According to the trustee, such right in fact arose from "the dealers [sic] contract for the purchase of Thompson's boats." Trustee's Brief in Opposition to ITT's Motion at p. 21.

There are two problems with this theory. First, as the trustee acknowledged, Thompson was not a party to the "dealer contracts"; rather, the only signatories were ITT and the individual dealership whose boat purchase ITT agreed to finance. Thus if an obligation running from ITT to Thompson arose from these contracts, it could only be based on the theory that Thompson was a third-party beneficiary of the dealership contracts.

Although this theory was advanced by the trustee, neither ITT nor the trustee briefed the question, and the trustee did not even submit the dealership contracts into evidence until some seven weeks after the hearing on the parties' motions. In submitting the contracts, the trustee renewed his assertion that they "creat[ed] a third-party beneficiary contract with Thompson ... as the third-party beneficiary." Supplement to Trustee's Brief

---

**14.** While I have no doubt that *Southeastern* is correct in suggesting that there are exceptions to § 440.9104(i), it is not clear that § 440.9201 is among them. Unlike §§ 440.9306(4)(d)(i) and 440.9318(1), § 440.9201 makes no obvious reference to setoff rights, stating only that "creditors" are subject to the terms of a security agreement. Given the generic, non-specific nature of the quoted term, one could plausibly argue that § 9–104(i) controls over § 9–201. *See, e.g., HCSC–Laundry v. United States,* 450 U.S. 1, 6, 101 S.Ct. 836, 67 L.Ed.2d 1 (1981) ("[I]t is a basic principle of statutory construction that a specific statute ... controls over a general provision ...."). Whether rightly or wrongly decided, *Southeastern* can certainly be faulted for sending mixed messages. *Compare* 145 Mich.App. at 719, 377 N.W.2d 900 (accepting "[t]he majority view ... that § 9104(i) is ... intended to relieve banks from having to complete the filing requirements of Article 9 in order to create [*sic*—perfect, *see* Mich. Comp. Laws § 440.9302(1)] a right of setoff") *with id.* at 721, 377 N.W.2d 900 ("The secured party should be able to rely on compliance with the [UCC]'s requirements for perfection and search of the public recording system as against the *unrecorded* interest of a party asserting set-off rights." (emphasis added; citation omitted)). The upshot of the case appears to be that a party need not (cannot?) file a financing statement to protect its setoff right, but may lose that right if it fails to do so.

at p. 3. But the trustee did not cite, nor could I find, any language in the contract which specifically identifies Thompson, let alone which obligates ITT to furnish a benefit directly to Thompson. I therefore reject the trustee's contention that Thompson was a third-party beneficiary of the dealership contracts. *See* Mich. Comp. Laws § 600.1405(1) ("A promise shall be construed to have been made for the benefit of a person ... [if] the promisor ... has undertaken to give or to do ... something *directly to* or for said person." (emphasis added)); *St. Gabriel Parish Credit Union v. Barnett Pontiac,* 16 Mich.App. 1, 5–6, 167 N.W.2d 459 (1969) ("The loan contract [to finance the purchase of an automobile] was not intended to be for the direct benefit of ... Barnett Pontiac[, the seller of the automobile].... Neither the promissory note nor the chattel mortgage made any reference to Barnett Pontiac .... Barnett Pontiac was only an incidental beneficiary of the loan agreement.").

Even if Thompson could successfully assert third-party rights under the dealership contracts, the trustee's theory is still fatally flawed. Paragraph 2 of the Floorplan Repurchase Agreement provides in pertinent part as follows:

> This Agreement shall in no way bind [ITT] to finance any [boats], but shall apply only to transactions accepted by [ITT] for financing, which acceptances shall be indicated by [ITT's] issuance of an approval number or a draft or other instrument to [Thompson] in payment of the invoice [sent to ITT by Thompson] .... *[ITT's] obligation to finance [boats] shall be binding on [ITT]* only *if:* (i) the [boat] has been shipped to the Dealer not more than ten ... days prior to the invoice date; (ii) the [boat] is delivered to the Dealer within thirty ... days following [ITT's] acceptance; (iii)[ITT] ha[s] received [Thompson's] invoice for such [boat] within ten ... days from the date of delivery of the [boat] to the Dealer; and (iv)[ITT] ha[s] not revoked [its] acceptance prior to the shipment of the [boat] to the Dealer.

(emphasis added). It is clear from the highlighted portion of the foregoing text that, in the event conditions (i) through (iv) are satisfied, ITT's obligation to provide financing—i.e., to pay Thompson for the boat(s) in question—became fixed.

■ Of course, this obligation could not be quantified without reference to external documents, such as the invoices forwarded to ITT and, perhaps, the individual dealership contracts. But § 440.9318(1)(a) imposes no requirement that the extent of liability be ascertainable from the four corners of the contract itself: to fall within the scope of that statute, the claim need only "arise" from the contract. *See Webster's Third New International Dictionary* (1961) (defining the verb "arise" as meaning "to originate from a specified source").

■ By virtue of ¶ 2, Thompson's claims against ITT meet that criterion. So regardless of whether Thompson could establish a right of payment based on the dealership contracts, the fact remains that it could do so based on the ITT/Thompson contract. Accordingly, § 440.9318(1)(a)'s requirement that the counterclaims arise from the same contract is satisfied. Pursuant to that statute, then, the trustee's security interest in the reserve account is subject to ITT's right to reduce the amount owed on that account to the extent of its claims against Thompson.

The last hope for the trustee is in his guise as a hypothetical judicial lien or execution creditor under § 544(a). If such a creditor is an assignee under Mich. Comp. Laws § 440.9318, then of course the trustee's rights under § 544(a) are, like his rights under §§ 547(b) and 551, subordinated by § 440.9318(1)(a) to ITT's recoupment right. I will not decide whether that is the case, however, because § 544(a) is of no avail to the trustee even if § 440.9318 does not encompass involuntary transfers of property interests.

■ Under Michigan law, a judgment creditor can obtain the equivalent of a judicial lien on an obligation owed to the judgment debtor by means of a garnishment writ served on the obligor. *See* Mich. Comp. Laws § 600.4011; *see also, e.g., Attorney General v. Ambassador Ins. Co.,* 166 Mich. App. 687, 696, 421 N.W.2d 271 (1988) (Garnishment gives rise to a "lien [which] at-

taches upon service of the writ.”); *In re Arnold,* 132 B.R. 13, 15 (Bankr.E.D.Mich. 1991). A longstanding principle underlying the law of garnishment is that, in attempting to collect the obligation from the garnishee, the judgment creditor has no greater rights than would the judgment debtor. *See, e.g., Brogdon v. American Automobile Ins. Co.,* 290 Mich. 130, 134, 287 N.W. 406 (1939); *Kidd v. Minnesota Atlantic Transit Co.,* 261 Mich. 31, 34, 245 N.W. 561 (1932). This basic principle is simply an application of what has more generically been described as the “derivative title rule,” one aspect of which provides that “a judgment creditor may seize from another party only what the judgment debtor may seize.” L. Kalevitch, *Setoff and Bankruptcy,* 41 Clev. St. L.Rev. 599, 629 n.108 (1993).

By the terms of the parties’ contract, ITT would have been able to assert its right of recoupment against Thompson were the latter to seek payment of the balance in the reserve account. In accordance with the derivative title rule, then, ITT would have the same right vis-à-vis a creditor who garnisheed the reserve account. Thus the judicial-lien-creditor status which the trustee enjoys by dint of § 544(a)(1) would not insulate him from ITT’s recoupment claims.

Left for consideration are the trustee’s powers as an execution lien creditor under § 544(a)(2). As one would expect, the derivative title rule applies with equal force in this context. *See, e.g., Kalamazoo Trust Co. v. Merrill,* 159 Mich. 649, 656, 124 N.W. 597 (1910); *Brady v. Sloman,* 156 Mich. 423, 425, 120 N.W. 795 (1909); *Nall v. Granger,* 8 Mich. 450, 453–54 (1860); *Powell v. Whirlpool Employees Fed. Credit Union,* 42 Mich. App. 228, 231, 201 N.W.2d 683 (1972); *see also* Mich. Comp. Laws §§ 600.6034 and 600.6017(3). There being no exception to that rule which would be applicable here, the trustee’s rights in the reserve account acquired pursuant to § 544(a)(2) cannot defeat ITT’s right of recoupment.

Because the trustee’s rights are subject to ITT’s recoupment right, his motion for partial summary judgment will be denied, and ITT’s motion seeking the same relief will be granted. In granting ITT’s motion, however,

I stress that I am ruling only that whatever rights in the reserve account the trustee may have pursuant to §§ 547(b) or 544(a) are subject to ITT’s contractual right of recoupment. As ITT acknowledged, issues concerning the balance in the reserve account and the extent of Thompson’s liability to ITT have yet to be resolved.

### CONCLUSION

The premise for ITT’s motion to dismiss is that exercise of its recoupment right will fully deplete the reserve account. The validity of that premise cannot be confirmed by reference to the second amended complaint, and so the motion will be denied.

Whether derived from § 547(b) or § 544(a), the trustee’s rights in the reserve account are subject to ITT’s right to use the account to recoup claims that it has against Thompson under the ITT/Thompson contract. ITT is therefore entitled to partial summary judgment with respect to that issue, and the trustee’s motion must be denied.

An appropriate order shall enter.